HUGHES, J.
hWe granted certiorari in this case to review an appellate court reversal of a jury verdict, which found that the plaintiffs failed to prove that the defendant physician had committed medical malpractice; the appellate court rendered judgment in favor of the plaintiffs, imposing liability on the defendant physician and his insurer for failure to obtain informed consent in accordance with Louisiana’s Uniform Consent Law.[1] For the reasons that follow, we *926 reverse the appellate court and remand with instructions.
FACTS AND PROCEDURAL HISTORY
On May 13, 2007, within days of his twenty-seventh birthday, Clyde Snider, Jr., was hospitalized at CHRISTUS St. Patrick Hospital (“St. Patrick”), in Lake Charles, Louisiana, for a suspected myocardial infarction. Mr. Snider was treated by cardiologist Dr. Jean King White, who diagnosed him with coronary artery disease and acute coronary syndrome, which was treated with angioplasty and the implantation of a heart stent in Mr. Snider’s circumflex artery. He was also placed |2on medications, including a cholesterol-lowering medication, a beta-blocker,[2] and a blood thinner.[3]
On August 28, 2007 Mr. Snider sought treatment at the Beauregard Memorial Hospital (“Beauregard”) emergency room in DeRidder, Louisiana for shortness of breath, chest pains, dizziness, lightheadedness, and faintness. Mr. Snider disclosed his past medical history, which included the May 2007 heart attack and coronary artery disease treatment, as well as diabetes, hypertension, hyperlipidemia, and a strong family history of premature coronary artery disease. Beauregard cardiologist Dr. Robin Yue diagnosed Mr. Snider with symptomatic bradycardia, as his heart rate fell as low as thirty-five beats per minute (a normal heart rate is considered to be at least sixty beats per minute). Dr. Yue recommended heart catheterization and implantation of a pacemaker; Mr. Snider consented. The procedures were performed later that day, and Mr. Snider was discharged from the hospital the following day.
On the day of his discharge from Beauregard, Mr. Snider sustained an unrelated injury to the area of his pacemaker, when, on his return home, his two-year-old daughter ran to greet him and jumped into his arms, striking his chest and causing injury to the surgical site. Mr. Snider returned to the Beauregard emergency room that evening, complaining of numbness in his left arm and pain in his shoulder. Mr. Snider was examined by Dr. Yue, who noted redness, swelling, severe tenderness at the pacemaker surgical site, left shoulder pain, and left arm weakness. Because Dr. Yue was leaving town on a previously-scheduled business | atrip, Mr. Snider was left in the care of Dr. Flynn A. Taylor, who ordered that Mr. Snider be monitored for signs of infection and hema-toma at the pacemaker implant site. Deeming outpatient antibiotic treatment appropriate, Dr. Taylor discharged Mr. Snider from Beauregard on September 3, 2007.
*927 On September 4, 2007 Mr. Snider returned to St. Patrick, where he was previously treated for his May 2007 cardiac problems, and was admitted to the hospital. He was examined by his treating cardiologist there, Dr. White, who found symptoms of infection at the pacemaker surgical site. Dr. White recommended removal of the pacemaker. The next day, Dr. Michael C. Turner, a cardiovascular surgeon, removed the pacemaker.
Subsequently, Mr. Snider filed a medical malpractice complaint against Dr. Yue, which was presented to a medical review panel. The medical review panel concluded that Dr. Yue had failed to comply with the appropriate standard of care and that his conduct was a factor in the “minor resultant damage.” The medical review panel issued the following reasons for their decision:
Dr. Yue rushed the decision for implantation of a permanent pacemaker in this patient. He should have stopped the beta-blocker and the rivaroxaban for 24-48 hours, and monitored the patient for possible improvement or deterioration in heart rate, before making the decision about a permanent pacemaker. Except for the relatively minor complication of a hematoma, and the surgical scar after pacemaker extraction, we found no evidence of any long-term, major injury to this patient.
On December 16, 2010 Mr. Snider and his then-wife, Lisa Snider, individually and on behalf of their minor child, filed suit against Dr. Yue and his liability insurer, Louisiana Medical Mutual Insurance Company, seeking recovery for damages arising out of Dr. Yue’s alleged negligence in the treatment of Mr. Snider on August 28, 2007. The Sniders alleged that Dr. Yue was at fault for: (1) failing to exercise a reasonable degree of skill and competence possessed and ordinarily exercised by members of his profession; (2) faffing to provide Mr. pSnider with diligent and skillful care; (3) failing to undertake conservative treatment to resolve Mr. Snider’s medical condition and failing to stop his blood thinner medication prior to performing surgery; (4) proceeding to surgery for implantation of a pacemaker when Mr. Snider’s condition and medications made said treatment contraindicated; (5) failing to consult with Mr. Snider’s treating physician when Mr. Snider specifically asked that he be consulted; (6) failing to educate Mr. Snider on his true condition and the exact treatment being recommended and implemented; and (7) performing unnecessary surgery on Mr. Snider, resulting in complications requiring further treatment and surgery.
In March of 2012 this case was tried before a jury, which ruled in favor of Dr. Yue, finding that Mr. Snider had not proved by a preponderance of the evidence that Dr. Yue breached the applicable standard of care owed to Mr. Snider. The plaintiffs’ subsequent motion for judgment notwithstanding the verdict and, alternatively, for new trial was denied by the district court judge, who stated that the jury verdict was not clearly contrary to the law and evidence.
The plaintiffs then filed an appeal to the Third Circuit Court of Appeal, urging multiple assignments of error,[4] including: (1) the jury erred in finding that the plaintiffs failed to prove by a preponderance of the evidence that Dr. Yue deviated from the appropriate standard of care; (2) the jury verdict and district court judgment were *928 contrary to law and the evidence, because (a) Dr. Yue failed to disclose reasonable therapeutic alternatives and risks as, required by the Uniform Consent Law, (b) Dr. Yue failed to show that he contacted Mr. Snider’s treating physician or reviewed Mr. Snider’s prior medical records to determine the extent of Mr. Snider’s prior bradycardia and medical treatment by Dr. White, (c) no evidence was presented to show the medical review panel, opinion was ^unreasonable or that Dr. Yue’s conduct constituted negligence, (d) the undisputed evidence showed that Dr. Yue violated the applicable standard of care owed to Mr. Snider when he failed to disclose his financial incentive arrangement with Beauregard (which created an incentive for Dr. Yue to fail to refer Mr. Snider back to his treating cardiologist at St. Patrick and to proceed with a pacemaker implementation without first undertaking conservative medical care), and (e) defense questioning of the plaintiffs’ expert witnesses and defense closing arguments improperly appealed to a locality bias as to Beauregard’s recruitment of Dr. Yue as a cardiologist for the hospital; and (3) the district court erred in denying the plaintiffs’ motion for judgment notwithstanding the verdict and, alternatively, for new trial. The appellate court, finding merit in, and ruling on, only the assignment of error alleging that Dr. Yue failed to properly obtain Mr. Snider’s informed consent to the pacemaker implantation surgery, reversed the jury verdict after concluding that Dr. Yue failed to provide to Mr. Snider, in the consent form, all of the information required by LSA-R.S. 40:1299.40(E). The appellate court reasoned that, although Mr. Snider signed a consent form, he did not give informed consent for the pacemaker implantation because of the in-sufficiencies in the form. Thus, the appellate court found that Mr. Snider met his burden to prove that his consent would have been reasonably withheld if he had been adequately informed of the “non-emergent nature of his condition” and of the “low-risk alternative of doing nothing.” The appellate court rendered judgment in favor of the plaintiffs and against the defendants on the issue of liability and remanded the matter to the district court to allow the parties an opportunity to complete the record as to damages (the'issue of damages had been severed from the issue of liability and no quantum evidence was presented at trial after the jury verdict absolved the defendants of liability). See Snider v. Louisiana Medical Mutual Insurance Company, 2012-1068 (La.App. 3 Cir. 2/27/13), 129 So.3d 61, 2013 WL 692522.
| nThis court granted the defendants’ subsequent application for review. See Snider v. Louisiana Medical Mutual Insurance Company, 2013-0579 (La.4/26/13), 112 So.3d 230. The defendants maintain that the appellate court erred: in failing to adhere to the proper standard of review; in substituting its judgment on the weight of evidence, evaluation of facts, and determinations of credibility for those of the jury; in reversing the jury verdict on liability; and in its interpretation and application of the Uniform Consent Law.
LAW AND ANALYSIS

Standard of Review

Article Y, Section 10, of the Louisiana Constitution provides that appellate jurisdiction in civil matters extends to both law and facts. Questions of law' are reviewed de novo, without deference to the legal conclusions of the tribunals below. This constitutional provision has also been interpreted as giving an appellate court the power to decide factual issues de novo, but the exercise of an appellate court’s constitutional authority to make a de novo *929 review of a factual finding has been limited by the jurisprudential rule that a trial court’s factual findings will not be upset unless they are manifestly erroneous or clearly wrong. See Wooley v. Lucksinger, 2009-0571 (La.4/1/11), 61 So.3d 507, 553-54.
Nevertheless, where trial court legal error interdicts the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the ' record by 17applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735.
The appellate court in this case determined that the jury legally erred in exonerating the 'defendants, " because the consent form used by Dr. Yue did not fully comply with Subsection (E) of LSA-R.S. 40:1299.40.[5] Therefore, we are called upon to review the appellate court’s finding of legal error in the district court judgment.

Uniform Consent Law

Louisiana enacted its Uniform Consent Law, as LSA-R.S. 40:1299.40, in 1975. Prior to the amendment of LSA-R.S. 40:1299.40 in 1990 to add Subsection (E), battery-principle cases and negligence cases involving lack of informed consent were concurrently' available to a patient/plaintiff. See Thibodeaux v. Jurgelsky, 2004-2004 (La.3/11/05), 898 So.2d 299, 303 (citing Pizzalotto v. Wilson, 437 So.2d 859 (La.1983) (discussing the cause of action for battery); LaCaze v. Collier, 434 So.2d 1039 (La.1983) (discussing the cause of action for lack of informed consent); and Gary L. Boland, The Doctrine of Lack of Consent and Lack of Informed Consent in Medical Procedure in Louisiana, 45 La.L.Rev. 1 (1984)). As stated in Subsection (E) of LSA-R.S. 40:1299.40, in a suit against a physician or other health care provider, involving a health care liability or medical malpractice claim- based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, “the only theory on which recovery may be obtained is that of negligence Rin failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.” See LSA-R.S. 40:1299.40(E)(2)(a).[6] .Louisiana jurisprudence requires- that a plaintiff in an action based on a failure to obtain informed consent prove the following four elements in order to prevail:- (1) a material risk existed *930 that was unknown to the patient; (2) the physician failed to disclose the risk; (3) the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment; and (4) the patient suffered injury. See Brandt v. Engle, 2000-3416 (La.6/29/01), 791 So.2d 614, 619 n. 1.
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, a patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.[7] Hondroulis v. Schuhmacher, 553 9So.2d 398, 411 (La.1988) (on rehearing).
*931 The Uniform Consent Law provides three approaches for obtaining informed consent. See LSA-R.S. 40:1299.40(E)(2)(b) (“Consent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of ... Subsection [E] as another method by which to evidence a patient’s consent to medical treatment.”).[8]
First, under Subsection (A) of LSA-R.S. 40:1299.40, consent to any medical or surgical procedure could be obtained by “handwritten consent,”[9] which: (1) sets forth in general terms the nature and purpose of the procedure(s) and the known | inrisks of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and/or of disfiguring scars associated with such procedure(s); (2) acknowledges that such disclosure of information has been made and that all questions asked about the procedure(s) have been answered in a satisfactory manner; and (3) is signed by the patient.[10] Upon compliance with Subsection (A), consent is “presumed” to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts. See LSA-R.S. 40:1299.40(A)(1).[11]
Second, under Subsection (C) of LSA- *932 R.S. 40:1299.40,[12] when consent to medical treatment from a patient has been secured “other than” in accordance with Subsection (A) of LSA-R.S. 40:1299.40, the explanation to the patient must | , include the matters set forth in Subsection (A), and an opportunity must have been afforded to the patient for asking questions concerning the procedure(s) to be performed, which must have been answered in a satisfactory manner. Consent obtained under LSA-R.S. 40:1299.40(0, is considered “valid and effective” and is “subject to proof according to the rules of evidence in ordinary cases.”
Third, under Subsection (E) of LSA-R.S. 40:1299.40, informed consent may be obtained by making the disclosures required by the Louisiana Medical Disclosure Panel (“Panel”), which was created within the Department of Health and Hospitals to determine which risks and hazards related to medical care and surgical procedures must be disclosed by a physician or other health care provider to a patient and to establish the general form and substance of such disclosure, pursuant to LSA-R.S. 40:1299.40(E)(3)(a).[13] The Panel is tasked with identifying and examining all medical treatments and surgical procedures in which physicians and other health care providers may be involved, in order to determine which of those treatments and procedures do or do not require disclosure of the risks and hazards to the patient. The Panel prepares separate lists of those medical treatments and surgical procedures that do or do not require disclosure, and, for those treatments and procedures that do require disclosure, the Panel establishes the degree of disclosure required and the form in which the disclosure will be made. See LSA-R.S. 40:1299.40(E)(4)(a) and (b).[14] The Panel lists are promulgated in accordance with the Administrative Procedure Act, LSA-R.S. 49:950 et seq. See LSA-R.S. 40:1299.40(E)(4)(c).[15] Before a patient gives consent to any medical or surgical procedure that appears on a Panel list requiring 112disclosure, the physician or other health care provider must disclose to the patient the risks and hazards involved in that kind of care or procedure. See LSA-R.S. 40:1299.40(E)(5).[16]
*933 A physician or other health care provider who chooses to utilize the lists prepared by the Panel in connection with obtaining a patient’s consent is considered to have complied with the requirements of the subsection if disclosure is made as provided in LSA-R.S. 40:1299.40(E)(6). See LSA-R.S. 40:1299.40(E)(5). Pursuant to LSA-R.S. 40:1299.40(E)(6),[17] consent to medical care that appears on a Panel list requiring disclosure is considered effective if it: (1) is given in writing; (2) is signed by the patient; (3) is signed by a competent witness; and (4) specifically states, in such terms and language that a layman would be expected to understand, the risks and hazards that were involved in the medical care or surgical procedure in the form and to the degree required by the Panel. When the Panel has made no determination regarding a duty of disclosure for medical care or a surgical procedure, the physician or other health care provider is under a general duty to disclose as otherwise imposed by the Uniform Consent |1sLaw. See LSA-R.S. 40:1299.40(E)(7)(b).[18]
In order “to be covered” by the provisions of Subsection (E) of LSA-R.S. 40:1299.40, Paragraph (E)(7)(c)[19] directs that the physician or other health care provider who will actually perform the contemplated medical or surgical procedure must also: (1) disclose the risks and hazards in the form and to the degree required by the panel; (2) disclose additional risks, if any, particular to a patient because of a complicating medical condition; *934 (3) disclose reasonable therapeutic alternatives and risks associated with such alternatives; (4) relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the Panel; and (5) provide an opportunity for the patient to ask any questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge in writing that he answered such questions, the receipt of which must also be acknowledged in writing. See LSA-R.S. 40:1299.40(E)(7)(c).[20]
luWhen the disclosures are given as required by, and a consent form is executed in accordance with, Subsection (E), the consent is admissible in evidence and creates a rebuttable presumption of compliance with LSA-R.S. 40:1299.40(E)(5) and (6), and this presumption must be included in a jury charge. See LSA-R.S. 40:1299.40(E)(7)(a)(i).[21] Conversely, the failure to disclose risks and hazards required to be disclosed under LSA-R.S. 40:1299.40(E)(5) and (6) is also admissible in evidence and creates a rebuttable presumption of a negligent failure to conform to the duty of disclosure set forth in LSA-R.S. 40:1299.40(E)(5) and (6); such a presumption must likewise be included in a jury charge. See LSA-jR.S.15 *935 40:1299.40(E)(7)(a)(ii).[22] Nevertheless, a failure to disclose may be found not negligent if there was an emergency as defined in LSA-R.S. 40:2113.6(0[23] or if for some other reason it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.
The surgical procedure at issue in the instant case was the placement of a pacemaker,[24] and, as listed in 48 La. Admin. Code, § 2349, the Panel requires disclosure of the following risks and hazards for that procedure:[25]
L. Automatic Implantable Cardio-verter Defibrillator Implantation (Permanent Pacemaker)
1. bleeding requiring blood transfusion or surgery;
2. hemorrhage (bleeding) into the lungs, the pericardium (sac which surrounds the heart), and the chest cavity;
11fi3. pericardial tamponade (compression of the heart due to accumulation of blood or fluid in the sac around the heart);
4. myocardial infarction (cardiac arrest/heart attack);
5. brain damage (stroke);
6. pneumothorax (collapse of lung);
7. perforation of heart or great vessels;
8. injury to artery or vein entered or studied;
9. possible need for surgery due to complications;
*936 10. arrhythmia and conduction disturbances (irregular heart beat);
11. damage to trachea (windpipe) and/or pharynx (throat);
12. trauma to vocal cords which may result in temporary or permanent vocal cord injury that may require surgical repair.
# * *
P. Temporary Pacemaker Placement
1. injury to artery or vein entered or studied;
2. hemorrhage (bleeding) into the lungs, the pericardium (sac which surrounds the heart), the chest cavity and elsewhere;
3. pericardial tamponade (compression of the heart due to accumulation of blood or fluid in the sac around the heart);
4. brain damage (stroke);
5. myocardial infarction (cardiac arrest/heart attack);
6. pneumothorax (collapse of lung);
7. perforation of heart or great vessels;
8. possible need for surgery due to complications;
9. arrhythmia and conduction disturbances (irregular heartbeat);
10. trauma to vocal cords which may result in temporary or permanent vocal cord injury that may require surgical repair;
11. displacement of stent or instrument requiring retrieval.
In the instant case, the written consent form signed by Mr. Snider informed him that the procedures that he would be undergoing were the “PLACEMENT OF A PERMANENT PACEMAKER AND LEADS” and a “Heart Cath.” The purpose of the implantation of the pacemaker was described on the form as: “IMPLANTING A SMALL DEVICE IN THE CHEST WALL TO REGULATE [MR. SNIDER’S] HEART RATE AND RHYTHM.” The consent form listed risks generally associated with surgical treatment or procedures accompanied by anesthesia (i.e., “death, brain damage, disfiguring scars, quadriplegia (paralysis from neck down), paraplegia (paralysis |17from waist down), the loss or loss of function of any organ or limb, infection, bleeding, and pain ”), and further referred Mr. Snider to risks identified by the Panel or determined by his doctor, which were stated on the form as being provided in an attachment. The attachment listed the following additional risks identified for the placement of a pacemaker: “LONGER HOSPITAL STAY,” “REPEATED SURGERY,” “INFECTION,” “LEAD DISLODGMENT,” “BLEEDING,” “LEAD PROBLEMS,” “PACEMAKER PROBLEMS,” and “DEATH.” Notably, several blank lines were not filled in on the consent form, which were provided for remarks regarding Mr. Snider’s condition, diagnosis, and/or additional risks particular to Mr. Snider “because of a complicating medical condition.” Further, where other blank lines were provided on the consent form for the listing of reasonable therapeutic alternatives and risks associated with those alternatives, only the following statement appeared: “SYMPTOMS FROM THE ABNORMAL HEART RATE WILL CONTINUE.” The consent form also contained Dr. Yue’s certification that he provided and explained the information contained in the consent form and answered all of Mr. Snider’s questions to the best of his ability. The consent form further included language of acknowledgment by Mr. Snider, agreeing that he had been provided an opportunity to discuss his surgical procedures with his physician, that he had been provided with an opportunity to *937 ask questions, and that all of his questions were answered satisfactorily.
We note that the consent form provided by Dr. Yue and signed by Mr. Snider did not specifically state, nor was there any other evidence presented establishing, that Dr. Yue related to Mr. Snider that consent was being obtained pursuant to the lists formulated by the Panel. See LSA-R.S. 40:1299.40(E)(7)(c)(iv) (stating that “[i]n order to be covered by the provisions of this Subsection, the physician or other health care provider who will actually | isperform the contemplated medical or surgical procedure shall ... [rjelate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the [Panel]”).[26] Although the first paragraph of the consent form stated that risks of the proposed surgery were required to be disclosed under Louisiana law “as defined by the Louisiana Medical Disclosure Panel or as determined by [the patient’s] doctor” (emphasis added), the consent form did not list the risks identified by the Panel. Rather, the risks listed were those “identified by the physician.”[27]
The district court judge did not issue a jury instruction based on a failure to comply with LSA-R.S. 40:1299.40(E). Because certain items were omitted from the consent form in this case (such as, the risks and hazards identified by the Panel[28] ), which were required for compliance with Subsection (E), if compliance with Subsection (E) had been an issue before the jury, the jury should have been instructed (pursuant to Paragraph (E)(7)(a)(ii)) that there was a rebuttable presumption that Dr. Yue was negligent in his duty of disclosure. Instead, the district court judge instructed the jury that in a medical malpractice suit against a doctor “a signed, written consent form provides a rebuttable presumption of valid consent.” Furthermore, the jury instructions actually given by the district court judge corresponded more with an evaluation of compliance with the requirements hnof Subsections (A) or (C) (which require that the physician or health care provider advise the patient of the nature and purpose of the procedure and the known risks associated with the procedure of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and/or of disfiguring scars [29]).
*938 Thus, presumably, the district court judge did not conclude that Subsection (E) compliance was an issue in this case.
Therefore, the appellate court ruling that the failure of Dr. Yue to comply with all requirements of Subsection (E) of LSA-R.S. 40:1299.40 constituted a lack of informed consent as a matter of law was in error, because consent could have been obtained by Dr. Yue by compliance with Subsection (E), or by compliance with Subsection (A), or by compliance with Subsection (C) of LSA-R.S. 40:1299.40. Subsection (E) expressly states that consent to medical treatment under that subsection is “an alternative” to the provisions of Subsections (A) and (C) and that Subsection (E) compliance is “another method by which to evidence a patient’s consent to medical treatment.” See LSA-R.S. 40:1299.40(E)(2)(b) (emphasis added). See also Thibodeaux v. Jurgelsky, 898 So.2d at 304 (stating that despite the 1990 amendment to the Uniform Consent Law that added Subsection (E), Subsections (A) and (C) “still provide methods of obtaining and proving informed consent of the patient”). Our review of the record in this case reveals that ample evidence was presented upon which the jury could have found that the written consent form signed by Mr. Snider, together with the verbal information Dr. Yue testified that he provided to Mr. Snider, constituted informed consent under Subsections (A) or (C) of the Uniform Consent Law.
Rplnstead of concluding that the jury erred as a matter of law because Dr. Yue’s consent form did not comply with Subsection (E) of the Uniform Consent Law, the appellate court should have employed a manifest error analysis to the jury’s factual finding that Dr. Yue obtained informed consent from Mr. Snider. The question of whether informed consent was or was not given is a question of fact to be resolved by the factfinder, and the manifest error standard of review applies to such a finding of fact on appellate review. See Thibodeaux v. Jurgelsky, 898 So.2d at 315-17; Brandt v. Engle, 791 So.2d at 621.
Under the manifest error standard of review, a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). There is a two-part test for the reversal of a factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). See also Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the issue to be resolved by a reviewing court is not whether the trier-of-fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Where the factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimo *939 ny, including the evaluation and resolution of conflicts in expert21 Mtestimony. Bellard v. American Central Ins. Co., 2007-1335 (La.4/18/08), 980 So.2d 654, 672. See also McGlothlin v. Christus St. Patrick Hospital, 2010-2775 (La.7/1/11), 65 So.3d 1218, 1231-32.
Numerous instances of conflicting statements appear in the testimony presented in the instant case. Most notably, the expert witnesses disagreed over whether the appropriate course of treatment for Mr. Snider, in August of 2007, was to continue him on his beta-blocker medication and surgically implant a pacemaker to treat his bradycardia (which was a side effect of the beta-blocker medication), as recommended by Dr. Yue and confirmed as appropriate by Dr. Freddy Abi-Samra (an expert witness for the defense), or to discontinue the beta-blocker medication and assume a wait-and-see approach as to whether the bradycardia would resolve, as suggested by plaintiffs’ expert witnesses. Both Dr. Yue and Dr. Abi-Samra testified that the administration of beta-blocker medication is of great importance to a patient such as Mr. Snider, who has suffered a heart attack, for the prevention of future heart attacks and for the treatment of the angina (chest pain) that he repeatedly experienced. In such cases, Drs. Yue and Abi-Samra testified that implantation of a pacemaker to treat the brady-cardia was clearly appropriate under the relevant guidelines and was within the applicable standard of care. Also, Dr. Yue testified, contrary to the plaintiffs’ testimony, that he advised Mr. Snider of his treatment options (which were to continue the beta-blocker medication and implanting the pacemaker to fix the low heart rate problem or to discontinue the medication and wait to see how he was doing), that Mr. Snider consented to the pacemaker procedure, and that Mr. Snider did not ask that his previous cardiologist be consulted prior to the pacemaker implantation. In ruling in favor of Dr. Yue, the jury obviously credited the defense evidence that informed consent was given by Mr. Snider over the plaintiffs’ evidence to the contrary and found that there was a reasonable factual basis in the record for its ruling.
I ^CONCLUSION
The jury apparently concluded that Mr. Snider gave informed consent in this matter, finding that Dr. Yue did not breach the standard of care. The appellate court attributed legal error to the jury’s finding because Dr. Yue did not comply with Subsection (E) of LSA-R.S. 40:1299.40. However, as compliance with the requirement of informed consent was alternatively attainable under Subsection (A) or (C), we conclude the appellate court erred. The appellate court should have applied a manifest error standard of review to the jury’s factual finding that informed consent was given in this case. Therefore, we reverse the appellate court decision, and remand this matter to the appellate court with instructions to consider and rule upon plaintiffs’ assignments of error, including those assignments of error pretermitted by the appellate court, in accordance with the views expressed herein.
DECREE
For the reasons assigned herein, we reverse the appellate court’s judgment and remand this matter to the appellate court for disposition of the plaintiffs’ assignments of error in accordance with this opinion.
REVERSED; REMANDED TO THE COURT OF APPEAL, THIRD CIRCUIT.
JOHNSON, Chief Justice, concurs in result.
KNOLL, Justice, concurs and assigns reasons.

. At all pertinent times, the Uniform Consent Law was found in former LSA-R.S. 40:1299.40, which was repealed and re-enacted as LSA-R.S. 40:1299.39.5, 40:1299.39.6, *926 and LSA-R.S. 40:1299.39.7 by 2012 La. Acts, No. 759, § 2, effective June 12, 2012. Unless otherwise noted, the laws referenced herein are to the version(s) in effect in 2007, when this cause of action arose.

. The beta-blocker was discontinued during the May 2007 hospitalization because Mr. Snider developed mild symptomatic bradycar-dia (a condition of irregularly low heart rate); however, during a subsequent June 7, 2007 out-patient office visit to Dr. White, Mr. Snider was placed on another beta-blocker medication.

. Mr. Snider was entered into a pre-FDA-approval trial of the blood thinner "rivaroxa-ban” (later marketed under the brand name “Xarelto ®”). In this one-year "double-blind” study, Mr. Snider received either a placebo or rivaroxaban; neither Mr. Snider, nor Dr. White, knew at the time whether Mr. Snider was taking the placebo or the rivarox-aban. By the time of trial, the study had ended, and it became known then that Mr. Snider had actually been administered riva-roxaban.

. The plaintiffs’ assignments of error to the appellate court do not appear in the record before us, nor are they set forth in the appellate court opinion; we summarize these assignments of error as recited by the plaintiffs in their brief to this court.

. The appellate court found the pacemaker implantation consent form deficient for failing to state in the form: the risks posed by Mr. Snider’s medical conditions, including the immediate condition allegedly necessitating the proposed procedure (noting the form did not state that Mr. Snider’s condition was so critical that he virtually had no choice but to consent to the procedure); the risks posed by the medications he was taking; the "reasonable therapeutic alternatives” to the procedure; and the risks associated with those alternatives.

. The substance of Paragraph (E)(2)(a) of former LSA-R.S. 40:1299.40 now appears in LSA-R.S. 40:1299.39.5(D).

. The doctor's duty is to disclose all risks which are "material.” A risk is. material when a reasonable person, in what the doctor knows or should know to be. the patient’s position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy. The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great. The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. Some expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk that a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient’s position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony. Further, there must be a causal relationship between the doctor’s failure to disclose material information and material risk of damage to the patient. Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff’s position would have consented to the treatment or procedure had the material information and risks been disclosed. Nevertheless, a doctor is not required to disclose material risks or information when a genuine emergency arises, harm from a failure to treat is imminent and outweighs harm threatened by the proposed treatment, and the patient is unconscious or otherwise incapable of consenting. In situations of that kind the physician should, however, attempt to secure a relative's consent if possible. But if time is too short to accommodate discussion, the doctor should proceed with treatment. Furthermore, a doctor has a "therapeutic privilege” to withhold disclosure of a material risk when the physician reasonably foresees that disclosure will cause the patient to become ill or emotionally distraught so as to foreclose a rational decision, complicate or hinder treatment, or pose psychological damage to the patient. Such a privilege must be carefully circumscribed, however, for1 otherwise it might devour the disclosure rule itself. Even in this kind of situation, the doctor should attempt to make disclosure to a close relative and obtain his consent. In addition, the physician is not required to disclose risks that are: commonly understood, obvious, already known to the patient, not reasonably foreseeable, or not material. Hondroulis v. Schuhmacher, 553 So.2d at 411-13. Without pertinent case-specific information patients would lack the ca *931 pacity to reason and make judgments on their own. They would therefore be deprived of the freedom to personally decide intelligently, voluntarily and without coercion whether to undergo the recommended treatment. The practical effect of the statute would be to deprive or burden an individual's right to decide to accept or forego medical treatment by substantially limiting access to information essential to a meaningful decision regarding the therapy proposed by the physician. Id. at 416.

. The substance of former LSA-R.S. 40:1299.40(E)(2)(b) now appears in LSA-R.S. 40:1299.39.5(E).

. Along with other similar changes to the statute, the phrase "handwritten consent” was deleted from former LSA-R.S. 40:1299.40(A)(1) by 2008 La. Acts, No. 738, § 1, effective July 3, 2008, and was replaced with "the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.” The substance of LSA-R.S. 40:1299.40(A)(1), as amended in 2008, now appears in LSA-R.S. 40:1299.39.5(A).

. If the patient for any reason lacks legal capacity to consent, then the consent form may be signed by a person who has legal authority to consent on behalf of such patient in such circumstances. LSA-R.S. 40:1299.40(A)(1). Hereinafter any reference to a "patient,” for purposes of informed consent, will also refer to any person authorized by law to consent to medical treatment for such patient.

.Paragraph (A)(1) of former LSA-R.S. 40:1299.40 provided:
Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

. Subsection (C) of former LSA-R.S. 40:1299.40 provided:
Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
The substance of former LSA-R.S. 40:1299.40(C) now appears in LSA-R.S. 40:1299.39.5(0.

. The substance of former LSA-R.S. 40:1299.40(E)(3)(a) now appears in LSA-R.S. 40:1299.39.6(B)(1).

. The substance of former LSA-R.S. 40:1299.40(E)(4)(a) and (b) now appears in ' LSA-R.S. 40:1299.39.6(J)(1) and (2).

. The substance of former LSA-R.S. 40:1299.40(E)(4)(c) now appears in LSA-R.S. 40:1299.39.6(J)(3).

. Paragraph (E)(5) of former LSA-R.S. 40:1299.40 provided:
Before a patient or a person authorized to consent for a patient gives consent to any medical or surgical procedure that appears on the panel's list requiring disclosure, the physician or other health care provider shall disclose to the patient, or person authorized to consent for the patient, the risks and hazards involved in that kind of care or procedure. A physician or other health care provider may choose to utilize the lists prepared by the panel and shall be considered to have complied with the require *933 ments of this Subsection if disclosure is made as provided in Paragraph (6) of this Subsection.
The substance of former LSA-R.S. 40:1299.40(E)(5) now appears in LSA-R.S. 40:1299.39.6(M).

. Paragraph (E)(6) of former LSA-R.S. 40:1299.40 provided:
Consent to medical care that appears on the panel’s list requiring disclosure shall be considered effective under this Subsection, if it is given in writing, signed by the patient or a person authorized to give the consent and by a competent witness, and if the written consent specifically states, in such terms and language that a layman would be expected to understand, the risks and hazards that are involved in the medical care or surgical procedure in the form and to the degree required by the panel under Paragraph (4) of this Subsection.
The substance of former LSA-R.S. 40:1299.40(E)(6) now appears in LSA-R.S. 40:1299.39.6(N).

. The substance of former LSA-R.S. 40:1299.40(E)(7)(b) now appears in LSA-R.S. 40:1299.39.6(O)(2).

. Paragraph (E)(7)(c) of former LSA-R.S. 40:1299.40 provided:
In order to be covered by the provisions of this Subsection, the physician or other health care provider who will actually perform the contemplated medical or surgical procedure shall:
(i) Disclose the risks and hazards in the form and to the degree required by the panel;
(ii) Disclose additional risks, if any, particular to a patient because of a complicating medical condition, either told to the physician or other health care provider by the patient or his representative in a medical history of the patient or reasonably discoverable by such physician or other health care provider;
(iii) Disclose reasonable therapeutic alternatives and risks associated with such alternatives;
(iv) Relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the Louisiana Medical Disclosure Panel; and
(v) Provide an opportunity to ask any questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge in writing that he answered such questions, to the patient or other person authorized to give consent to medical treatment, receipt of which shall be acknowledged in writing.
The substance of former LSA-R.S. 40:1299.40(E)(7)(c) now appears in LSA-R.S. 40:1299.39.6(P).

. We note that the wording of Paragraph (E)(7)(c) has been the subject of some dispute in this case; however, we find no ambiguity in the language used. The text of former LSA-R.S. 40:1299.40 made use of both the words "Section” and "Subsection" in referring to other parts of the law. A reading of LSA-R.S. 40:1299.40 together with LSA-R.S. 1:1 ("This Act shall be known as the Louisiana Revised Statutes of 1950 and shall be cited as R.S. followed by the number of the Title and the number of the Section in the Title, separated by a colon. Example: Section 1 of Title 20 shall be cited as R.S. 20:1.”) and 1:14 ("Unless otherwise indicated in the context, references in the Revised Statutes to Titles, Sub-titles, Chapters, Parts, Sub-parts, or Sections shall mean Titles, Sub-titles, Chapters, Parts, Sub-parts, or Sections of the Revised Statutes ....”) makes it clear that "Section,” as used in LSA-R.S. 40:1299.40, refers to the particular section of Title 40 containing the Uniform Consent Law (§ 1299.40), while "Subsection" refers to Subsection (A), Subsection (B), Subsection (C), Subsection (D), Subsection (E), and/or Subsection (F) of § 1299.40. Thus, where former LSA-R.S. 40:1299.40(E)(7)(c) specifically stated that ”[i]n order to be covered by the provisions of this Subsection ...” (emphasis added), it referenced only Subsection (E) (detailing the third method of obtaining informed consent, which utilized the risks and hazards lists prepared by the Panel), not Subsections (A) or (C) (detailing the other two methods of obtaining informed consent). Under the current Uniform Consent Law, as re-enacted by 2012 La. Acts, No. 759, former Subsection (E) now appears in a separate section (§ 1299.39.6) from former Subsections (A) and (C) (which now appear in § 1299.39.5); this change eliminates any uncertainty about the application of former LSA-R.S. 40:1299.40(E)(7)(c) (since former Paragraph (E)(7)(c) of LSA-R.S. 40:1299.40 now appears as Subsection (P) of LSA-R.S. 40:1299.39.6 and reads, in pertinent part, "[i]n order to be covered by the provisions of this Section ...” (emphasis added)). While, arguably, on this point, 2012 La. Acts, No. 759, would thus be retroactively applicable to the instant litigation, as interpretive legislation (see M.J. Farms, Ltd. v. Exxon Mobil Corporation, 2007-2371 (La.7/1/08), 998 So.2d 16, 28-30), we find it unnecessary to reach the issue, as we decide the case on another basis, as expressed hereinafter.

. Former LSA-R.S. 40:1299.40(E)(7)(a)(i) provided:
Both the disclosure made as provided in Paragraph (5) of this Subsection and the failure to disclose based on inclusion of any medical care or surgical procedure on the panel’s list for which disclosure is not required shall be admissible in evidence and shall create a rebuttable presumption that the requirements of Paragraphs (5) and (6) of this Subsection have been complied with and this presumption shall be included in the charge to the jury....
The substance of former LSA-R.S. 40:1299.40(E)(7)(a)(i) now appears in LSA-R.S. 40:1299.3 9.6(0)(l)(a).

. Former LSA-R.S. 40:1299.40(E)(7)(a)(ii) provided:
The failure to disclose the risks and hazards involved in any medical care or surgical procedure required to be disclosed under Paragraphs (5) and (6) of this Subsection shall be admissible in evidence and shall create a rebuttable presumption of a negligent failure to conform to the duty of disclosure set forth in Paragraphs (5) and (6) of this Subsection, and this presumption shall be included in the charge to the jury; but failure to disclose may be found not to be negligent, if there was an emergency as defined in R.S. 40:2113.6(C) or, if for some other reason, it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.
The substance of former LSA-R.S. 40:1299.40(E)(7)(a)(ii) now appears in LSA-R.S. 40:1299.39.6(0)(l)(b).

. The term "[ejmergency services” is defined by LSA-R.S. 40:2113.6(C) as meaning "services ... that must be provided immediately to stabilize a medical condition which, if not stabilized, could reasonably be expected to result in the loss of the person's life, serious permanent disfigurement or loss or impairment of the function of a bodily member or organ, or which is necessary to provide for the care of a woman in active labor if the hospital is so equipped and, if the hospital is not so equipped, to provide necessary treatment to allow the woman to travel to a more appropriate facility without undue risk of serious harm.”

. In this case, Dr. Yue testified that he informed the Sniders that the pacemaker was a permanent pacemaker, while the Sniders testified that they were told the pacemaker was to be temporarily implanted to stabilize Mr. Snider’s heart rate so that he could return to Lake Charles for treatment by his cardiologist there, Dr. White. The consent form signed by Mr. Snider clearly stated the procedure was the implantation of a "permanent” pacemaker. However, we reproduce the Panel lists of risks and hazards associated with both the implantation of a permanent pacemaker and the implantation of a temporary pacemaker, for the sake of completeness, and we note that the risks and hazards disclosed by Dr. Yue to Mr. Snider did not fully include the risks contained in either of these Panel lists.

. Section 4 of 2012 La. Acts, No. 759, declared that all existing medical disclosure lists duly promulgated by either a prior Panel or by the Department of Health and Hospitals Secretary would remain effective and would be deemed to have been promulgated by the newly-created Panel until such time as those lists could be updated and re-promulgated pursuant to the provisions of Acts 759.

. The substance of former LSA-R.S. 40:1299.40(E)(7)(c)(iv) currently appears as LSA-R.S. 40:1299.39.6(P)(4).

. Although the page attached to the consent form, which listed the risks associated with a pacemaker placement, contained a heading at the top of the page that read: "MATERIAL RISKS IDENTIFIED BY THE LOUISIANA MEDICAL DISCLOSURE PANEL,” no list of risks immediately followed the heading. Instead, beneath that heading was a space for the patient's name, followed by a description of the procedure, and below those items was another heading, which read: "MATERIAL RISKS IDENTIFIED BY PHYSICIAN.” Immediately following the latter heading was the list of risks (quoted hereinabove), and these risks were not the same as the list of risks identified for this procedure by the Panel (as stated in 48 La. Admin. Code, § 2349).

. The plaintiffs also alleged that the consent form failed to list all of the reasonable therapeutic alternatives available (as required by LSA-R.S. 40:1299.40(E)(7)(c)(iii)) and the additional risks particular to Mr. Snider because of his complicating medical conditions (as required by LSA-R.S. 40:1299.40(E)(7)(c)(ii)), such as the contraindications associated with his blood thinner medication.

. We note that the requirements for Subsection (A) or (C) consent are jurisprudentially supplemented by the additional requirements imposed by Hondroulis v. Schuhmacher, 553 So.2d at 411 (which was decided prior to the addition of Subsection (E) to the Uniform Consent Law), imposing a duty on a physician or health care provider, where circumstances permit, to disclose (though not necessarily in writing): the nature of a patient's ailment or . condition, the prospects of success of the proposed treatment or procedure, the risks of *938 failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.