EDWIN A. LOMBARD, Judge.
hThe plaintiff, Irene Taylor, appeals the district court judgment dismissing her medical malpractice action against the defendants LAMMICO a/k/a Louisiana Medical Mutual Insurance Company, Elizabeth N. Blanton, M.D.,. and Newco Women’s Medical Center, LLC. After review of the record in light of the applicable law and arguments of the parties, we affirm the judgment of the trial court.

Relevant Facts and Procedural History

In July 2006, the plaintiff consulted with the defendant, Dr. Blanton, an OB-GYN specialist, after the treatment prescribed by her primary care physician failed to resolve problems related to heavy menstrual bleeding and uterine fibroid tumors. The plaintiff was a forty-year old, medically-obese woman with a history of three C-sections and tubal ligation. After confirming the uterine fibroid diagnosis with a pelvic ultrasound, Dr. Blanton recommended a hysterectomy. The plaintiff rejected surgery, opting to continue with the Depo-Provera[1] injection treatment prescribed by her primary care physician. The plaintiff consulted Dr. Blanton again in August 2007; Dr. Blanton recommended *902 a hysterectomy[2] or |2myomectomy;[3] the plaintiff rejected surgery and continued the Depo-Provera injections. In July 2008, the plaintiff consulted Dr. Blanton who again opined the plaintiffs only options were a hysterectomy, a myomectomy, or further Depo-Provera injections. The plaintiff agreed to the surgery. The plaintiff signed the pre-surgery informed consent form. It is undisputed that,- prior to executing the form, the plaintiff was not advised of any other therapeutic alternatives (beyond the hysterectomy, myomec-tomy, and Depo-Provera injections), but was advised that a perforated bowel was a risk of the surgery to which she was consenting.
Dr. Blanton performed the total laparo-scopic hysterectomy with robotic assistance on July 25, 2008, at West Jefferson Medical Center. The plaintiffs bowel was perforated during the surgery. It is also undisputed that she endured extensive pain and suffering as a result of the surgical mishap. The medical review panel concluded, however, that no evidence supported a finding that the plaintiffs care fell below the applicable standard. Shortly thereafter, the plaintiff filed the instant medical malpractice suit in the 25th Judicial District Court for the Parish of Plaquemines naming as defendants Dr. Blanton, Jeanne G. Hutchinson, M.D., Newco Women’s Medical. Center, LLC, and their insurer, Louisiana Medical Mutual Insurance Company (LAMMICO). Pertinent to this appeal, the plaintiff claimed that Dr. Blanton’s treatment fell below the applicable standard of care because she failed to “disclose reasonable therapeutic alternatives to the surgery” and, accordingly, the plaintiffs consent to the surgery was not an informed one.
1 aAfter a two-day bench trial in September 2018, the district court dismissed the plaintiffs medical malpractice suit with prejudice. The plaintiff appeals only the dismissal of her lack of informed consent claim.

Standard of Review

The question of whether informed consent was or was not given is a question of fact to be resolved by the factfinder and, thus, we review such a finding of fact under the manifest error standard of Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Accordingly, we may not set aside a trial court’s finding of fact in the, absence of “manifest error” or unless it is “clearly wrong.” Id., 549 So.2d at 844. Where the findings of fact are based on determinations regarding the credibility of witnesses, we must defer to the factfin-der’s determination and, specifically, “[w]here the factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous.” Snider v. Louisiana Medical Mut. Ins. Co., 18-0579, p. 20 (La.12/10/13), 130 So.3d 922, 939. “This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony.” Id., 13-0579 at pp. 20-21, 130 So.3d at 938-939.

Applicable Law

Pursuant to the Louisiana Uniform Consent Law, La. Stat.Rev.Stat. 40:1299.40,[4] and related jurisprudence, a plaintiff in an action based on a failure to *903 obtain informed consent must prove four elements: (1) the existence of a material risk unknown to the patient; (2) the physician’s failure to disclose the risk; (3) disclosure of the risk would have led a reasonable patient in the patient’s position |4to reject the medical treatment or choose a different course of treatment; and (4) the patient suffered injury. Id., 13-0579 at p. 8, 130 So.3d at 929-930. “The informed consent doctrine is based on the principle that every human being of adult years and sound mind has the right to determine what shall be done to his or her own body,” and, therefore, physicians are “required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to the proposed course of treatment.” Id., 13-0579 at p. 8, 130 So.3d at 930 (citing Hondroulis v. Schuhmacher, 553 So.2d 398, 411); see also id., 13-0579 at p. 13, 130 So.3d at 934 (to be covered by La.Rev. Stat. 40:1299.40(E), the physician who will perform the surgical procedure must also “disclose reasonable therapeutic alternatives and risks association with such alter-natives_”). Thus, “[ujnder the Louisiana informed consent doctrine, a physician is required to provide [her] patient with sufficient information to permit the patient to make an informed and intelligent decision on whether to submit to the proposed course or treatment.” Pertuit v. Tenant Louisiana Health Systems, 10-0654, 10-0655, 10-0656, p. 5 (La.App. 4 Cir. 9/22/10), 49 So.3d 932, 936. Accordingly, although a physician should inform a patient of alternatives that exist to the surgical procedure, “a physician has no duty to disclose alternative treatments or procedures which are not accepted as feasible.” Id., 10-0654 at pp. 6-7, 49 So.3d at 937.

Evidence Adduced at Trial

Dr. Blanton, a member of the American Congress of Obstetricians and Gynecologists (“ACOG”) acknowledged that (as indicated in the ACOG article) a | ¡/‘gonadotropin-releasing hormone agonist” such as Lupron[5] could “provide a 35 to 65 percent reduction in fibroid volume within three months of treatment.” She cautioned, however, “I’ll think you’ll find that it’s temporary.” Under questioning, Dr. Blanton agreed that Lupron, although generally taken only for six months, could be taken longer by some patients with “add-back therapy” and, additionally, could be used with some patients as an “adju-vant” therapy[6] to shrink the uterus and fibroids prior to surgery. When asked as to whether the alternative therapies discussed in the ACOG article were “well-recognized [ ] alternative therapies for treatment of women with fibroid [sic] like [the plaintiff], Dr. Blanton responded, “[f]or some women in some circumstances.”
Dr. Blanton avowed that she “made a medical decision in [her] professional capacity [that Lupron therapy was] not appropriate for [the plaintiff]” and, thus, discussed only the treatment options valid for the plaintiff: myomectomy, hysterectomy, or a continuation of Depo-Provera injections. According to Dr. Blanton, even if Lupron therapy stopped the plaintiff’s bleeding and shrunk the fibroids, such results would have been temporary and a vaginal hysterectomy was “absolutely not” an option for the plaintiff. Specifically, Dr. Blanton pointed that that the plaintiffs *904 three C-sections were “generally considered to be a pretty-strong contraindication to a vaginal hysterectomy” and, thus, a vaginal hysterectomy “would not have been a safe operation for her.”
When asked specifically for the reasons underlying her conclusion that Lupron was not a viable option for the plaintiff, Dr. Blanton stated:
IfiAs far as taking Lupron in order to shrink the fibroids, you know, we typically reserve that for women who are looking towards future fertility, where shrinking the fibroids and then looking towards trying to have a baby is something that’s really, really important. Or we use Lupron in a situation where we’re trying to save someone from having to have a large vertical incision for fibroids because their fibroids are so, so large and it’s just mechanically difficult to remove them. But Lupron has a very temporary effect. Once you stop the Lupron, you end right back where you started. So, we use Lupron even in some situations where somebody says, “You know, I’m getting married in six months, and I really want to try to get through the next six months and then have surgery afterwards.” But it’s not a long-term fix. It’s very expensive. It does have a lot of side effects. And it really doesn’t have much of a role in [sic] somebody who’s done with childbearing and who doesn’t have fibroids of a size that they’re not easy to get out.
When plaintiffs counsel questioned Dr. Blanton about the possibility of treating a patient with Lupron for more than six months with the use of “add-back therapy,”[7] she explained that “you’re talking about pre-operative therapy; so, you’re still having a hysterectomy at the end of that time.” Although plaintiffs counsel insisted that the ACOG article suggested Lupron could be taken for “years,” Dr. Blanton responded that it could only be taken for “a single year.”
Dr. Blanton’s reasoning and conclusions were supported by the expert testimony of Dr. Thomas E. Nolan, a board-certified OB-GYN, who summarized the plaintiffs medical case as follows:
... Mrs. Taylor is a — was a 40-year-old woman who had had problems with vaginal bleeding from fibroids for several years. She was treated with Depo-Provera. Depo-Provera is a drug that’s given by injection that’s a progesterone agent that one of the major side effects is gaining weight, and she did gain about 25 pounds over the time that she began the injections. And the other thing is— is that sometimes they start bleeding despite having the fibroids. Additionally, fibroids have a bad habit of growing, especially in 17women that have estrogen from their ovaries, which she has. And what happens is the fibroids continue to grow.
So, in this particular case, she came in, she was having bleeding problems. Her uterus had enlarged, and she desired to have this finished. So, the most reasonable alternative or the most reasonable way to approach this is a hysterectomy because fibroids will continue to grow almost regardless of what therapies you have. Myomectomy could be considered, but with the size of her uterus and the number of fibroids — once you just take out one or two fibroids, you can get more fibroids later. So, unfortunately, this is like — estrogen’s like fertilizer on a field, and the fibroids continue to grow.
*905 So, at — in many cases, the best thing to do — and these are common: 70 percent of white woman have them, 80 percent of African Americans have fibroids. But when the fibroids become too big— and a lot of women have small fibroids that can be controlled medically, but hers were large. One of them was sub-mucosal, which is the position of the fibroid in relationship to the inner lining of the uterus, which causes bleeding; and a lot of times you can’t control a submucous fibroid that’s causing bleeding without doing — either removing it, which can be a very bloody and can be a difficult procedure if it’s done hysteros-copy or by a laparoscopy.
[[Image here]]
And you also know that, if you’re going to do it, they’re going to come back; and they’re going to come back even worse in most cases.
So, if you have a patient that’s had their fertility — and she’s had a tubal litigation [sic]; she’s had three Cesarian sections, so her childbearing was done essentially at that point in time — she’s 40 years old, she already has an enlarged uterus that’s going to probably continue to enlarge, she’s going to have more bleeding, the better part of valor is just to go ahead and do the hysterectomy.
When questioned about what constitutes a patient’s informed consent, Dr. Nolan opined:
... First off, informed consent, you don’t have to discuss every possible alternative. You have to discuss the ones that are important to that particular patient and their condition. And from the alternatives to hysterectomy, ACOG, that has been offered, there’s a statement, “Hysterectomy remains the most common surgical treatment for leiomyo-mas because it is the only definitive treatment and eliminates the possibility of recurrence. Many women seek an alternative because they deser — desire future childbearing or wish to retain their uteri even if they have completed childbearing. As alternates — alternatives to hysterectomy become increasingly available, the efficacies and risks of these are important to delineate,” which I interpret to mean that not all these particular alternatives are necessarily benign and don’t have their own complications.
lsIn response to the question whether it was reasonable for Dr. Blanton to only discuss “continuing Depo-Provera or having a myomectomy” as alternatives to a hysterectomy, Dr. Nolan stated:
Well, the Depo she could continue. The myomectomy with somebody that had as many leiomyomas[8] as she did, you could do it; but I suspect you would be back doing a hysterectomy within the next three to five years, which has been the experience if — and that’s why it’s usually offered only for women looking for childbearing.
When asked directly whether, in offering or discussing those alternatives, Dr. Blanton complied with the OB-GYN standard of care, Dr. Nolan responded, ‘Yes, I do.”
When questioned specifically about the ACOG article, Dr. Nolan pointed out that the first alternative discussed in the article, contraceptive steroids to “shut down the ovaries and change the endometrium,” had been, in essence, accomplished by the Depo-Provera injection treatment. With regard to the second alternative discussed in the article, gonadotropin-releasing hormone agonists (ie., the generic category of the specific drug Lupron), Dr. Nolan ex *906 plained that “they’ve been around awhile” and they work by shutting down ovarian function, thereby triggering premature menopause and stopping production of estrogen and progesterone production. When asked directly whether, in his opinion, gonadotropin-releasing hormone agonist therapy would have been a reasonable alternative for the plaintiff in this case, Dr. Nolan stated:
No. Because they come back once you stop it. And, additionally, it changes the surgical planes when you’re trying to operate, so ... I got these drugs early on in my career, and we used them. We didn’t find them to be that effective, and we found the surgical dissections were more difficult; so, in my practice, I stopped using them.
-b.
Well, they come — within—after six months of therapy, you have to stop it, as a rule, or you’re supposed to. And it’s also very expensive. And the fi-broids just — once the estrogen starts stimulating the fibroids, they just start growing again. So, it’s a temporizing technique. It’s not a definite technique. In other words, it’s not going to stop the fibroids from growing except when it’s being used.
When asked a second time whether he believed that gonadotropin-releasing hormone agonist was a reasonable therapy to have been offered by Dr. Blanton to the plaintiff, Dr. Nolan reiterated:
No. She didn’t have an anemia problem; and that’s the other reason you use it, is to treat the anemia. So, she didn’t have an anemia problem, and the fi-broids would have come back.
After discussing the potential applicability of other therapies discussed in the ACOG article, Dr. Nolan was asked to specifically address Lupron. According to Dr. Nolan:
Lupron is a drug and to make — basically, your brain tells your ovary what to do. And what it does is it — the brain stops telling the ovary what to do, so the ovary stops turning out estrogen and progesterone as long as you’re giving it. However, with this, people get debilitating headaches; and it’s just — it’s only good for six to twelve months. And then, additionally, the surgical planes, which is what we dissect through, in my opinion are more difficult. And, additionally, she had had three Cesarean sections, so a vaginal hysterectomy on her would have been more difficult.
Finally, Dr. Nolan agreed with plaintiffs counsel that if Lupron had been administered to the plaintiff, her fibroids could have shrunk for six to twelve months but that the fibroids would have returned and continued to grow upon cessation of the Lupron. Dr. Nolan also conceded that “as an alternative to doing a hysterectomy right away, Dr. Blanton could have' prescribed Lupron so as to shrink the fi-broids, thereby making a vaginal hysterectomy more reasonable or more | inappropriate” and that such as theory has been “espoused.” However, Dr. Nolan qualified this concession:
Yeah. And it’s been espoused. And there’s another problem in this, and this is just a function of the reality of the practice of medicine: Most younger physicians don’t do a lot of vaginal hysterectomies; and, additionally, she had three C-Sections. So when you do a vaginal hysterectomy, you have to go between the uterus and the bladder; and if you don’t, you’re getting bleedings if you go through the uterus, and you can get into the urinary tree and have bad injuries to the urinary tract if you go the other way. And with the Cesarian sections, where you basically open that area and then it scars down, it can be a difficult dissection. So, most younger physicians *907 do very few vaginal hysterectomies, and most of them have gone to the laparo-scopic approach because of that.
Dr. Nolan reiterated that, pursuant to the informed consent requirement, Dr. Blanton could have discussed the continued use of Depo-Provera or myomectomy as possible alternatives to the hysterectomy but such therapy would have been “temporizing,” the fibroids would have grown, and “she would have ended up with a hysterectomy eventually.” When asked directly whether the OB-GYN standard of care required Dr. Blanton to inform the plaintiff of the “alternatives mentioned in the ACOG Practice Bulletin ... even though she had concluded that they were not appropriate for her,” Dr. Nolan emphatically responded “No.”
Dr. Blanton returned to testify specifically as to the Lupron therapy as discussed in the ACOG bulletin article relied upon by the plaintiff. After reiterating the temporary effect of Lupron therapy, Dr. Blanton explained why, in her opinion, Lupron was not appropriate for the plaintiff in this case:
I, honestly, don’t see that there’s any possible benefit that she would have had from the Lupron. I think, you know, had she taken Lupron for six months or a year, she would have probably had some significant side effects. You know, the weight gain she was unhappy with, with the Depo, she would have had the same side effect with the Lupron. And it is a — not an easy drug to take. You know, we — we almost judge the severity of people’s symptoms in endometriosis by Inhow willing they are to tolerate Lupron. If you — if you come in and you tell me that you can’t handle the side effects, I figure you weren’t having that much pain in the first place. But the side effects are rough. And — and Lu-pron, I think is really beneficial for women with fibroids in a setting where it’s going to change your management at the conclusion of — of using it or where you need to buy time. You know, you need to buy time because you’re trying to have a baby or your need to buy time because — I’ve even had a patient who’s finishing law school. You know, you need to buy time for some reason.
When asked directly whether it would have been appropriate to recommend Lu-pron therapy to the plaintiff as a potential alternative therapy in July 2008, Dr. Blan-ton responded:
... I don’t see that it would have given her value any [sic]. She took it for six months, she took it for a year, she stops it. The fibroids are going to grow right back. It’s — it’s going to make the fi-broids mushy and more difficult to operate on. And I don’t think there’s any possible way that it would have changed her long-term situation which is still that you’re going to need a hysterectomy. She would have had a year of unpleasant side effects with really no benefit whatsoever. You know, someone mentioned a vaginal hysterectomy afterwards. In — in my opinion, that’s — that’s not at all a reasonable option.
In response to the direct question as to whether, in her opinion, Lupron therapy itself or used as an agent to facilitate a vaginal hysterectomy was appropriate for the plaintiff, Dr. Blanton replied:
You mean to shrink the fibroids on a temporary basis? It might have shrunk them on. a temporary basis. It doesn’t always work. It’s not a guarantee. But shrinking the fibroids on a temporary basis when you’re 40 really gives you very minimal benefit because, once you stop it, the fibroids are going to grow back again and you’re going to have to deal with it for another 10 to 12 years, depending on when you go through menopause; and you haven’t really gained *908 anything at that point other than maybe some time.
La. 158 SOUTHERN REPORTER, 3d SERIES
When asked whether the plaintiff was a candidate for a vaginal hysterectomy, Dr. Blanton stated:
|12I mean, she had three prior sections. You know, I know Dr. Nolan said — you know, he’s a gener — different generation than I am — in some circumstances, he might have done a vaginal hysterectomy on someone, with three prior sections. I’ve had two C-sections. In a million years, I wouldn’t have a vaginal hysterectomy. It’s not safe.
Similarly, Dr. Blanton said that she would not have recommended a vaginal hysterectomy to plaintiff because “[i]t’s not safe.” Finally, in response to the question as to whether Lupron would have been a “reasonable alternative” to be discussed with the plaintiff in the context of her decision to have a hysterectomy, Dr. Blanton stated that it was her belief that Lupron “would have had no role in her management at all.” Finally, Dr. Blanton discussed the other alternative therapies addressed in the ACOG article, explaining why the therapies were not reasonable treatment alternatives for the plaintiff in this case.
On cross-examination, Dr. Blanton explained in graphic terms why a vaginal hysterectomy was unadvisable for the plaintiff:
... You do. a vaginal hysterectomy on someone who has three previous C-Sections, instead of going in from above and watching what you’re doing and taking the bladder away from the uterus, you do it blindly through the vagina. You take a- pair of scissors — and very literally you take a pair of scissors — and you go “clip” and you cut blindly through a piece of vagina. The — that is an art, and it’s not alw — and it is the most difficult part of a vaginal hysterectomy in any patient. And on a patient who had three C-sections, you have a very significant risk of making that first cut and looking at the inside of the bladder. If that happens, it can be very difficult to ever repair that in such a way that the patient doesn’t leak urine from the bladder — I mean, leak urine from the vagina. For that reason, most people consider sometimes one, sometimes multiple C-sections to be a direct contraindication to a vaginal hysterectomy.
When questioned as to why she did not specifically discuss adjuvant Lupron therapy with the plaintiff and, thus, prevented her from the opportunity to go to another doctor who would have prescribed adju-vant Lupron therapy for the plaintiff, Dr. Blanton explained:
11sPeople come to me for medical advice and my medical expertise. They don’t come to me to give them a laundry list of choices. They come to me for me to give them a reasonable list of choices and help them decide. It is not reasonable or appropriate to offer any given patient a laundry list of choices and then tell them, “Oh, that sounds great, but you can’t have it. Well, here, there’s this one. And that sounds great, and wouldn’t it be great if you could have that, but you can’t.” That’s not something that people come for. You don’t want that from your doctor.
[[Image here]]
I offer people any possible reasonable choice in their situation, not a choice that’s reasonable for someone else. I— I’m not going to offer her a choice that’s reasonable for somebody who’s 20 years younger. I’m not going to offer her a choice that’s reasonable for somebody 10 years older. I’m going to take everything about her into consideration and offer her the choices that make sense for her ... in my opinion. That’s what *909 people pay me for, my opinion. My opinion is valuable and legitimate.
Plaintiff’s counsel took issue with Dr. Blanton’s position, stating:
And that’s the question, isn’t it? Is it reasonable, or isn’t it reasonable. And you make the choice, as opposed to discussing it with my client.
In response, Dr. Blanton reiterated: “It’s my job to offer people what I believe are reasonable and appropriate choices and help them decide amongst those choices.”
In her rebuttal testimony, the plaintiff reiterated that Lupron therapy had not been discussed with her prior to her surgery, stating that she would have been “interested in knowing” about therapy “that would allow shrinkage of [her] uterus and eventually a — a—a vaginal hysterectomy. ...”
In addition, the plaintiff submitted a videotaped deposition of her expert witness, Dr. James Tappan. Dr. Tappan, a California board-certified OB-GYN, stated that the standard of care required Dr. Blanton to inform the plaintiff about all alternative therapies, including the use of Lupron or gonadotropin-releasing 114hormones.[9] According to Dr. Tappan, because Dr. Blanton did not have an “adequate” discussion of alternatives, including a review of “all practical alternatives,” the plaintiff did not have “adequate informed consent.” Therefore, Dr. Tappan concluded that Dr. Blanton did not offer the plaintiff the “standard of care.” In addition, Dr. Tappan stated that Lupron therapy would have reduced the size of the plaintiffs fibroids, thereby allowing for a vaginal hysterectomy which would have taken less time than the robotic surgery. He conceded that the fibroids would regrow once Lupron treatment stopped but asserted that data existed which suggested that Lupron therapy could be continued for a period of ten years.

Trial Court’s Reasons for Judgment

With regard to the issue of “informed consent” and Lupron therapy, the trial court reviewed the informed consent statute, La.Rev.Stat. 40:1299.40, and pertinent jurisprudence, specifically Snider, supra, and Pertuit, supra, and then concluded:
Plaintiff has failed to prove that she did not give her informed consent to the hysterectomy based on Dr. Blanton’s failure to inform about the use of Lu-pron therapy as an alternative to the surgery. Plaintiff did not prove that the Lupron therapy was a reasonable alternative to the hysterectomy for the treatment of her fibroids. Dr. Blanton was not required to inform plaintiff of alternatives that she did not consider reasonable. A reasonable patient in plaintiffs position would have consented to the hysterectomy.

Discussion

The plaintiff argues on appeal that the trial court erred in concluding that that “Dr. Blanton’s undisputed failure to inform [the plaintiff] of a nonsurgical, | ^alternative medical treatment to a total laparoscopic hysterectomy did not violate [the defendant’s] statutory duty.” In essence, the plaintiff asserts that Dr. Blan-ton had a statutory duty to inform the plaintiff of any alternative medical treatment and, more specifically, had a duty to advise her of adjuvant Lupron therapy, prior to surgery and her failure to do so *910 was a clear violation of the Louisiana Uniform Consent Act, La.Rev.Stat. 1299:40. In support of this argument, the plaintiff points to the article, “Alternatives to Hysterectomy in the Management of Leiomyo-mas” that appeared in the August 2008 bulletin issued by the ACOG wherein existing alternative treatments for uterine fibroids were reviewed. The plaintiff insists that, had she been informed of treatment with a “gonadotropin-releasing hormone agonists” such as Lupron, she would not have consented to the surgery and, in any event, she was denied the opportunity to make an informed choice as was her right.
To prevail on this claim — that adjuvant Lupron therapy was a reasonable alternative to her surgery — the plaintiff bears the burden of establishing that this alternative was an accepted medical treatment for the plaintiff’s condition. See Pertuit, 10-0654 at p. 6, 49 So.3d at 936. In other words, the plaintiff must establish that Lupron therapy was a reasonable alternative therapy for a patient in her circumstances: over forty-years old, medically obese, a medical history including three C-section births, an abdominal hernia, and tubal ligation.
Notably, there is no statutory requirement in Louisiana that a patient be informed of alternative therapies. Under Louisiana jurisprudence, a physician is required to provide “sufficient information,” Snider, 13-0579 at p. 8, 130 So.3d at 930 (emphasis added), and to “disclose reasonable | ^therapeutic alternatives,” Snider, 13-0579 at p. 13, 130 So.3d at 934 (emphasis added). Concomitantly, patients must be informed only of “feasible or appropriate” alternative treatments. Pertuit, 10-0694 at pp. 6-7, 49 So.3d at 937. A review of the evidence adduced at trial supports the trial court finding that Dr. Blanton, fulfilled these requirements, i.e., provided sufficient information, disclosed the reasonable therapeutic alternatives, and informed the patient of feasible and appropriate alternative treatments. In addition, a review of the evidence supports a finding that the plaintiff failed to prove that Lu-pron was a reasonable alternative therapy in her case.
Dr. Blanton testified that Lupron therapy was not a feasible treatment for the plaintiff because its primary purpose was to shrink fibroids for an eventual vaginal hysterectomy, a surgery that in her professional opinion would be extremely dangerous to the plaintiff because of her prior C-sections. Moreover, although the ACOG article relied upon by the plaintiff appeared after the patient’s surgery,[10] Dr. Blanton discussed Lupron therapy knowledgeably and clearly expressed her reasons for determining that it was not an appropriate treatment option for the plaintiff. Similarly, Dr. Nolan suggested that some “older” surgeons could perform a successful vaginal hysterectomy on a patient such as the plaintiff, but agreed that Lupron therapy was primarily used for the purpose of shrinking the fibroids in advance of a vaginal hysterectomy, a procedure that the younger generation of physicians was unlikely to recommend to or perform on a patient with the plaintiff’s medical history.
| ,7Pr. Tappan testified to the contrary, asserting that the plaintiffs-care fell below the standard of care. Inexplicably, Dr. Tappan declared that a generic “standard of care” had been transgressed but there is nothing in the record to indicate that statutory and/or jurisprudential requirements for “informed consent” in California *911 (where Dr. Tappan is licensed and practices) and Louisiana are identical. Moreover, Dr. Tappan was deposed as a medical expert, not a legal expert, and, therefore, his opinion as to whether Dr. Blanton’s actions were in violation of the Louisiana consent doctrine is problematic. In addition, although Dr. Tappan made reference to “data” that indicated (contrary to the testimony of Dr. Blanton and Dr. Nolan) that Lupron therapy could be continued for a period of ten years, he did not provide specific information as to either the data or the medical histories of the patients upon which the data was based.
As the Louisiana Supreme Court recently reiterated in the informed consent context, a factfinder’s determination to credit the testimony of one of two or more witnesses, including conflicting expert testimony, “can virtually never be manifestly erroneous.” Snider, 13-0579 at pp. 20-21, 130 So.3d at 938-939. Accordingly, we do not find that the trial judge was manifestly erroneous in electing to credit the testimony of Dr. Blanton and Dr. Nolan rather than Dr. Tappan or in finding that the plaintiff failed to show that Lupron therapy was a reasonable alternative or one which she would have chosen in light of her medical history.

Conclusion

After review of the record in light of the applicable law and arguments of the parties, we affirm the judgment of the district court.
AFFIRMED.

. Depo-Provera is a brand name for medrox-yprogesterone acetate, a contraceptive steroid injection for women that. contains the hormone progestin.

. A hysterectomy is an operation to remove a woman's uterus.

. Myomectomy is the surgical removal of fi-broids from the uterus; it allows the uterus to be left in place and preserves fertility.

.Effective June 12, 2012, the Uniform Consent Act, La.Rev.Stat. 40:1299.40 was repealed and re-codified as La.Rev.Stat. 40: 1299.39.6 and La.Rev.Stat. 40:1299.39.7. In 2008 and, thus, at all times pertinent to this matter, La.Rev.Stat. 40:1299.40, was in effect.

. Lupron is a prescription treatment for en-dometriosis, given as an injection. It is known to relieve the pain of endometriosis and reduce lesions.

. Adjuvant therapy, also called adjuvant care, is treatment that is given in addition to the primary, main, or initial treatment.

. “Add-back” therapy is a daily pill that one takes while on Lupron therapy to add back a small amount of the hormone progestin, which can help one manage certain side effects such as hot flashes and bone density loss.

. "Leiomyomas” are benign (non-cancerous) fibroid tumors located in the uterus.

. Gonadotropin-releasing hormone (GnRH), also known as luteinizing hormone-releasing hormone, is a neurohormone central to initiation of the reproductive hormone cascade. Gonadotropin-releasing agonists therapy stops menstrual periods and stops the growth and reduces the size of endometriosis sites. GnRH therapy is limited to a short period of time (3 to 6 months).

. The plaintiff underwent surgery on July 25, 2008, and the ACOG article was published the following month, in August 2008.