MAX N. TOBIAS, Jr., Judge.
hThe plaintiff, Latanya Fountain, sued the defendant, Dr. Washington Bryan, alleging that he breached the applicable standard of care when he failed to obtain her informed consent to perform a bilateral tubal ligation and ventral hernia repair by laparotomy leaving her with a large, disfiguring abdominal scar.[1] Ms. Fountain also alleged that Dr. Bryan’s negligence was the proximate cause of the pain, suffering, and loss of enjoyment of life that she suffered as a result of the disfiguring scar. Following a trial by jury, Dr. Bryan was found liable to Ms. Fountain for damages in the amount of $150,000.00, Thereafter, the trial court denied Dr. Bryan’s motion for judgment notwithstanding the verdict (“JNOV”) from which Dr. Bryan *731 has appealed. Finding the jury’s verdict is supported by the record evidence, and ' thus, is neither manifestly erroneous nor clearly wrong, we affirm.

Factual Background and Procedural History

Ms. Fountain first presented to Dr. Bryan, a physician practicing obstetrics and gynecology, for pre-natal care in October 2008, when she was approximately height weeks pregnant. Subsequently, Dr. Bryan delivered Ms. Fountain’s baby naturally on 5 May 2009. . During the course of . her pregnancy, based upon Ms. Fountain’s complaints of significant abdominal pain when full after eating, Dr. Bryan suspected she was suffering from a hernia, but chose not to address the issue at that time due to her pregnancy.
On 2 June 2009, during her six-week post-partum check-up, Ms. Fountain and Dr. Bryan discussed various birth control options, including a tubal • ligation as a means of permanently preventing future pregnancies. At that time, Ms. Fountain signed a state-mandated form consenting to a tubal ligation.[2] In a follow-up appointment on 30 June 2009, Ms. Fountain confirmed her desire to undergo the contemplated procedure. During this appointment, Ms. Fountain also complained of continued abdominal pain suggestive of a hernia, which Dr. Bryan advised he could surgically address at the time he performed the tubal ligation; ie., both surgeries could be accomplished in the same surgical setting. In order to confirm the existence of the suspected hernia, Dr. Bryan ordered a CT scan that day.[3] Additionally, according to Dr. Bryan, he preliminarily scheduled Ms. Fountain for a “mini laparotomy and ventral hernia repair” at Ochsner Foundation Clinic West-bank Campus (“Ochsner Hospital”) solely for purposes of reserving a firm day to perform the surgical procedures.
| sMs. Fountain returned to Dr. Bryan’s office on 6 August. 2009 for the pre-opera-tive consultation. According to Dr. Bryan, during .this consultation, he explained the different surgical options available in detail to Ms. Fountain and the risks associated with each one. Specifically, Dr. Bryan testified that he presented Ms. Fountain with two options. The first option involved making two separate incisions: one at the site of the lower abdomen near the fallopian tubes to allow tubal ligation by mini laparotomy, and the other at the navel to excise the hernia sac by laparotomy. The second option involved making only one incision at the navel site, where he could use a laparoscope instrument to destroy the fallopian tubes and also through which he could then extract the hernia sac. Having expressed her concerns to him about wanting only one incision, Dr. Bryan testified that he suggested to Ms. Fountain that rather than a laparotomy, he would attempt to perform the surgery laparo-scopically.[4]
*732 Based on her understanding that Dr. Bryan would be able, barring any emergency complications, to accomplish the procedures by laparoscopy through one relatively small incision, Ms. Fountain testified that she executed the written consent form during that consultation. The consent form informed Ms. Fountain that the procedures she would be undergoing included a “laparoscopic tubal ligation and ventral hernia repair.” The purpose of the laparoscopic procedures was described on the form as follows: “to cut into [her] belly, destroy [her] tubes in|4an attempt to keep [her] from getting pregnant and also to repair the defect in [her] belly.”[5] Ms. Fountain testified that while she understood Dr. Bryan was going to have to “cut into [her] belly” and that doing so would result in a scar, it' was her understanding and expectation, based on Dr, Bryan’s representations, that the laparoscopic procedure would be minimally invasive and that the single scar to her abdomen would be no more than two inches in length. According 'to Ms. Fountain, Dr.' Bryan' never discussed with her the ■ possibility of his performing the tubal ligation and hernia repair by laparotomy nor did he disclose-to her the risk of additional scarring associated with a laparotomy.
Five days later, on the morning of 11 August 2009, Ms. Fountain arrived at Ochsner Hospital for her scheduled surgery. Despite her written consent to undergo a tubal ligation and ventral hernia repair by laparoscopy, Dr. Bryan actually performed a bilateral tubal ligation and ventral hernia repair by laparotomy. As a result, instead of the two-inch scar Ms. Fountain was expecting and to which she claims she consented, she woke up from surgery to discover an approximate 15 centimeter (roughly six inches), T-shaped disfiguring scar on her abdomen.[6]
In 2010, Ms. Fountain filed a medical malpractice complaint against Dr. Bryan alleging that he breached the standard of care in failing to properly perform a ventral herniorrhaphy,[7] bilateral tubal ligation, and mini laparotomy resulting in the large, disfiguring abdominal scar, which sear caused her physical; mental, and | ^emotional damages. In November 2012, Ms. Fountain’s complaint was submitted to a medical review panel composed of Drs. Kathryn G. Wild, Charles Rene, and Richard D. Marino, who unanimously found that -the evidence supported the conclusion that Dr. Bryan failed to comply with the appropriate standard of care as charged by Ms. Fountain in her complaint.[8] The medical review panel issued the following reasons in support of their conclusion:
1. There is a lack of adequate documentation of informed consent for the procedure scheduled and performed. The patient was consented for laparo- ' scopic tubal ligation and ventral hernia repair, and the procedure scheduled was *733 a laparotomy with tubal ligation and ventral hernia repair. There is no evidence in the operative report that the procedure was started with laparoscopy and converted to laparotomy.
2. However, the procedure was appropriately performed, and post-operative management was appropriate.
3. We do not believe the patient suffered an injury due to the above.[9]
According to Dr. Bryan, because Ms. Fountain did not raise the issue of informed consent in the complaint that she filed with the medical review panel, he did not address the issue in his original submission. However,’ after the panel released its opinion finding a lack of adequate, documentation to support informed consent for the procedure scheduled and performed, Dr. Bryan filed a supplemental submission requesting reconsideration, which contained his explanation as to why | (¡it was medically reasonable for him to convert the tubal ligation by laparoscopy to tubal ligation by laparotomy.[10]
In February 2013, Ms. Fountain brought suit against Dr., Bryan and Ochsner Hospital.[11] The matter proceeded to trial before a jury on the issues of informed consent and causation. ■ At trial, Ms. Fountain maintained that, contrary to the consent form she signed, Dr. Bryan never attempted to perform the tubal ligation laparo-scopically, but rather, conducted the entire surgery by laparotomy, a surgery to which she did not consent. Moreover, she testi-fled that had she been informed that Dr. Bryan planned to perform a bilateral tubal ligation- and ventral hernia repair by lapa-rotomy and not laparoscopically, and that the risk of his do'ing so would result in a large, disfiguring abdominal scar, she never would have consented to the elective surgery at that time. In short, Ms. Fountain claimed she never consented to the surgery that Dr. Bryan actually performed or to the risks associated with that surgery and that she only, consented to the risks associated with laparoscopic surgery.
In contrast, Dr. Bryan testified that he indeed initiated Ms. Fountain’s surgery by laparoscopy and explained to the jury why he converted her tubal ligation and ventral hernia repair by laparoscopy to a laparoto-my. Specifically, he testified that on the morning of surgery, the hospital staff brought Ms. Fountain into the operating room, placed her in stirrups, and set up to do a tubal ligation by laparoscopy. He testified that he commenced the surgery by making an incision 17into the umbilicus site of her abdomen[12] with the intention of proceeding! with the tubal ligation by la-paroscopy, but unexpectedly encountered “peritoneum[13]. and intestines” that were protruding, alerting him to a much larger hernia sac than previously observed on radiography.’ Surmising the situation presented a risk of possible perforation to Ms. Fountain’s intestines by exposure to the heat of the laparoscope, Dr. Bryan testi *734 fied that he determined it was no longer safe for him to proceed with the tubal ligation laparoscopically. Accordingly, Dr. Bryan testified that, for the safety of Ms. Fountain, he abandoned -tubal ligation through use of the laparoscope and, instead, extended the incision and proceeded with a laparotomy to successfully accomplish both the tubal ligation and the ventral hernia repair, which it is undisputed that he did.
Ms. Fountain’s surgery was documented in a post-operative report prepared by Dr. Bryan within an hour and a half following her surgery, which report was introduced into evidence at trial. Dr. Bryan’s report documented that the procedure(s) he performed included: “Mini laparotomy;” “Bilateral tubal ligation;” and “Ventral Herni-orrhaphy.” [14] Specifically, he reported that a “[sjharp knife was used to make an incision and this was taken down carefully to the fascial defect, through which peritoneum and intestines were protruding. The sac having been identified, the fascia was taken down distal to this point leaving the sac intact. A bilateral tubal ligation was subsequently performed.” Thereafter, “attention was turned back to the hernia.” Having accomplished both the bilateral tubal ligation and herniorrhaphy, Dr. Bryan reported that the “patient tolerated these procedures | swell. There were no intraoperative complications.” On cross-examination at trial, Dr. Bryan conceded that his operative report did not indicate that he had initiated Ms. Fountain’s surgery laparoscopically, nor did it substantiate his contention that, due to unexpected circumstances and purportedly for her safety, he converted to laparotomy.
The nurses’ notes from the day of Ms. Fountain’s surgery were received into evidence at trial as part of the medical records. These notes indicated that when she arrived in the operating room, Ms. Fountain was transferred to the operating room bed and that a “safety strap was applied to her mid thighs” and “secured to [the] bed.” This notation was consistent with the anesthesiology record also in evidence, which documented that Ms. Fountain was placed in the “supine” position for surgery (ie., laying completely flat), as opposed to being placed in a “lithotomy” position (ie., ,in stirrups) as claimed by Dr. Bryan. The medical records contain no indication that the surgical instruments typically used in laparoscopic surgery were ever opened or that trocars[15] had been placed on the operative field. Instead of using trocars to cut into Ms. Fountain’s abdomen, as are typically used when initiating a laparoscopic procedure, Dr. Bryan’s operative report specifically states that “a sharp knife was used to make [the] incision.” When viewed together, Dr. Bryan’s operative report, the hospital nurses’ notes, and the anesthesiology record belie Dr. Bryan’s contention that he initiated Ms. Fountain’s surgery laparoscopically as he claimed he intended, and only thereafter, converted to laparotomy. The end result for Ms. Fountain was a completed |9bilateral tubal ligation, a successfully repaired ventral hernia, and a much-larger-than-anticipated permanent disfiguring scar to her abdomen.
On 16 March 2015, the jury returned a verdict finding Dr. Bryan liable to Ms. Fountain for failing to properly obtain her informed consent to perform the tubal ligation and ventral hernia repair by lapa-rotomy and that his failure to do so was a *735 proximate cause of the physical, emotional, and mental pain, suffering, and loss of enjoyment of life endured due to the consequential disfiguring abdominal scar. The trial court rendered judgment in accordance with the jury’s verdict on 31 March 2015. ■ •
On 8 April 2015, Dr. Bryan filed a motion and order for JNOV, which the trial court denied. This timely appeal followed.

Assignments of Error and Issues Presented for Review

On appeal, Dr. Bryan avers that the trial court’s denial of his motion for JNOV was manifestly erroneous because the jury’s verdict is. not supported by the facts adduced at trial. He also avers that the jury manifestly erred in finding that the lack of informed consent was the proximate cause of Ms. Fountain’s disfiguring scar. In addition, Dr. Bryan assigns multiple issues for our review, including:
(1) Is a physician presumed to have discharged his duty to obtain informed consent to a surgical procedure where the executed written consent form complies with the requirements of La. R.S. 40:1299.39.5;
(2) Are the risks identified and promulgated by the Louisiana Medical Disclosure Panel for a surgical procedure presumed to constitute adequate disclosure for an informed consent for that procedure;.'
(3) Can a jury determine the material risks required to be disclosed for an informed consent to a surgical procedure without benefit of expert testimony |inestablishing the frequency and severity of known risks of the procedure;
(4) What is a plaintiffs burden of proof to establish lack of informed consent to a surgical procedure;
(5) What is a plaintiffs burden of proof to establish lack of informed consent to a surgical procedure to which she had not consented;
(6) Did expert testimony identify any risks associated with the procedures actually performed that were not disclosed in the consent form signed by Ms. Fountain; and
(7) Did expert testimony establish that “but for” tubal .ligation with laparot-omy there would be no disfiguring scar?

Law and Analysis

Standard of Review
The question of whether informed consent was or was not given is a question of fact to be resolved by the fact finder, and the manifest error standard of review applies to such factual findings on appellate review. Snider v. Louisiana Medical Mut. Ins. Co., 13-0579, p. 20 (La.12/10/13), 130 So.3d 922, 938. Under the manifest error standard of review, a court of appeal may not set aside a trial court’s findings of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, in order to reverse a jury’s determination, an appellate court must find that’ a reasonable factual basis does not exist for the jury’s findings and, further, that the findings are clearly wrong. Henderson v. Ayo, 11-1605, p. 3 (La.App. 4 Cir. 6/13/12), 96 So.3d 641, 644; Brandt v. Engle, 00-3416, p. 10 (La.6/29/01), 791 So.2d 614, 621 (citing Rosell v. ESCO, 549 So.2d at 844). Consequently, the issue to be resolved- by a reviewing court is not whether the trier-of-fact was right, or wrong, but whether the Infact finder’s conclusion was a reasonable one. Snider, 13-0579, p. 20, 130 So.3d at 938 (citing Stobart v. State, Department of *736 Transp. and Development, 617 So.2d 880, 882 (La.1998)).
Further, where a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact made by the jury should not be disturbed upon review, even though the appellate court may believe its own evaluations and inferences are reasonable.[16] Rosales v. Loyola, 07-0517, p. 5 (La.App. 4 Cir. 12/12/07), 973 So.2d 858, 862 (citing Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978)). This rule equally applies to the evaluation and resolution of conflicts in expert testimony. Bellard v. American Cen. Ins. Co., 07-1335, p. 27 (La.4/18/08), 980 So.2d 654, 672.
Moreover, a motion for JNOY should be granted only when the evidence points so strongly in favor of the moving party that reasonable minds could not reach different conclusions. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991); La. C.C.P. art. 1811.
Based upon the assignments of error designated by Dr. Bryan, it is apparent that he seeks shelter from liability to Ms. Fountain on the basis pf the consent forms she signed prior to surgery. Specifically, he argues that because the forms she executed identified the material risks promulgated by the Louisiana Medical Disclosure Panel for the laparotomy he performed as required by La. R.S. |1240:1299.39.5,[17] he was entitled to a presumption that Ms, Fountain’s informed consent was properly obtained in this case and that the jury was clearly wrong in concluding otherwise. After reviewing the entire trial testimony, photographs, medical records, and the consent forms at issue in this case, we disagree.
Louisiana’s Uniform Consent Law
In 1975, Louisiana enacted a Uniform Consent Law, La. R.S. 40:1299,40.[18] Up until 1990, a patient/plaintiff could pursue his or her claim for lack of informed consent based on one of two theories of liability: a battery or negligence (i.e., a medical malpractice action). See Thibodeaux v. Jurgelsky, 04-2004, p. 7 (La.3/11/05), 898 So.2d 299, 303. In 1990, a significant amendment to La. R.S. 40:1299.40 was enacted, adding Subsection E thereto. Specifically, La. R.S. 40:1299.40 E(2)(a)[19] provides:
In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the *737 physician or other health care provider to disclose or adequately disclose the risks and hazards involved in the, medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.[20]
| i.Jn order for a plaintiff to prevail in an action based on a failure to obtain informed consent, he or she must prove: (1) a material risk existed that was unknown to the patient, (2) the physician failed to disclose the risk, (3) the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment, and (4) the patient suffered injury. Snider, 13-0579, p. 8, 130 So.3d at 929-30. Additionally, this court has recognized that in a case “where the plaintiff alleges there has been no consent, the law requires only proof of a material risk that was not disclosed and the occurrence of that risk.” Rosales, 07-0517, p. 6, 973 So.2d at 862.
In Snider, 13-0579, p. 8, 130 So.3d at 930, the Supremei, Court (citing its earlier decision on rehearing in. Hondroulis v. Schuhmacher, 553 So.2d 398, 411 (La.1988)), discussed the principles underlying Louisiana’s informed consent doctrine:
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has the right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an -informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, a patient should be told ■ the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failure to undergo any treatment or procedure, at all, and the risks of any alternate methods of treatment.
The Uniform Consent Law provides three approaches for obtaining informed consent. See Lá. R.S. 40:1299.40 E(2)(b) (“Consent to medical treatment may be luevidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of ... [Suhsjeetion [E] as another method by which to evidence a patient’s consent to medical treatment.”)[21]
First, pursuant to La. R.S. 40:1299.40 A(l),[22] consent to any medical or surgical procedure could be obtained by “handwritten consent,”[23]- which: (1) sets forth in *738 general terms the nature and purpose of the proeedure(s) and the known risks of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and/or of disfiguring scars associated with such procedure(s); (2) acknowledges that such disclosure of information has been made and that all questions asked about the procedure(s) have been answered in a satisfactory manner; and (3) is signed by the patient. Upon compliance with Subsection A, consent is “presumed” to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts. See La. R.S. 40:1299.40 A(l) (currently La. R.S. 40:1157.1 A).
Second, pursuant to La. R.S. 40:1299.40 C,[24] when’ consent to medical treatment from a patient, or from a person authorized by law to consent to medical | ifitreatment for the patient, has been secured “other than” in accordance with La. R.S. 40:1299.40 A, the explanation to the patient, or the person consenting for the patient, must include the matters set forth in Subsection A, and an opportunity must have been afforded for asking questions concerning the procedure(s) to be performed, which must have been answered satisfactorily. Under La. R.S. 40:1299.40 C (currently, La. R.S. 40:1157.1 C), consent is considered “valid and effective” and is “subject to proof according to the rules of evidence in ordinary cases.”
Third, pursuant to La. R.S. 40:1299.40 E, informed consent may be obtained by making the disclosures required by the Louisiana Medical Disclosure Panel (“the Panel”), which was created within the Department of Health and Hospitals to determine which risks and hazards related to medical care and surgical procedures must be disclosed by a physician or other health care provider to a patient and to establish the general form and substance of such disclosure, pursuant to La. R.S. 40:1299.40 E(3)(a).[25] The Panel is tasked with identifying and examining all medical treatments and surgical procedures in which physicians and other health care providers may be involved, in order to determine which of those treatments and procedures do or do not require disclosure of the risks and hazards to the patient. The Panel prepares separate lists of those medical treatments and surgical procedures that do or do not require disclosure and, for those treatments and procedures that do require disclosure, the Panel establishes the degree of disclosure required and the form in which the disclosure will be made. See La. R.S. h«40:1299.40 E(4)(a) and (b).[26] The Panel lists are promulgated in accordance with the Administrative Procedure Act, La. R.S. 49:950, et seq. See La. R.S. 40:1299.40 E(4)(c).[27] Before a patient gives consent to any medical or surgical procedure that appears on a Panel list *739 requiring disclosure, the physician or other health care provider must disclose to the patient the risks and hazards involved in that kind of care or procedure. See La. R.S. 40:1299.40 E(5).[28]
A physician or other health care provider who chooses to utilize the lists prepared by the Panel in connection with obtaining a patient’s consent is considered to have complied with the requirements of the subsection if disclosure is made as provided in La. R.S. 40:1299.40 E(6). See La. R.S. 40:1299.40 E(5).[29] Pursuant to La. R.S. 40:1299.40 E(6),[30] consent to medical care that appears on a list of the Panel requiring disclosure is considered effective if it: (1) is given in writing; (2) is signed by the patient; (3) is signed by a competent witness; and (4) specifically states, in such terms and language that a layman would be expected to understand, the risks and hazards that were involved in the medical care or surgical procedure in the form and to the degree required by the Panel. When the Panel has made no determination regarding the duty of disclosure for medical care or a surgical procedure, the physician or health care provider is under a general duty to | ^disclose as otherwise imposed by the Uniform Consent Law. See La. R.S. 40:1299.40 E(7)(b).[31]
In order “to be covered” by the provisions of Subsection E of La. R.S. 40:1299.40, Paragraph E(7)(c) directs that the physician or other health care provider who will actually perform the considered medical or surgical procedure must also: (1) disclose the risks and hazards in the form and to the degree required by the Panel; (2) disclose additional risks, if any, particular to a patient because of a complicating medical condition; (3) disclose reasonable therapeutic alternatives and risks associated with such alternatives; (4) relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the Panel; and (5) provide an opportunity for the patient to ask any questions about the contemplated medical or surgical procedure, ■ risks, or alternatives and acknowledge in writing that he answered such questions, the receipt of which must also be acknowledged in writing. See La. R.S. 40:1299.40 E(7)(c).[32]
When the disclosures are given as required by, and a consent form is executed in accordance with Subsection E, the consent is admissible in evidence and creates a rebuttable presumption of compliance with La. R.S. 40:1299.40 E(5) and (6), and this presumption must be included in a jury charge. See La. R.S. 40:1299.40(E)(7)(a)(i).[33] Conversely, the failure to disclose the risks and hazards required to be disclosed under La. R.S. 40:1299.40 E(5) and (6) is. also admissible in evidence and creates a rebuttable presumption of a negligent failure to conform |1sto the duty of disclosure set forth in La. *740 R.S. 40:1299.40 E(7)(a)(ii).[34] Nevertheless, a failure to disclose may be found to be not negligence if an emergency as defined in La. R.S. 40:2113.6 C[35] existed or if for some other reason it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.
In the case sub judice, the surgical procedure at issue included a bilateral tubal ligation and ventral hernia repair. As listed in 48 La. Admin. Code, pt. I, § 2303, the Panel requires disclosure of the following risks and hazards associated with “Female Genital System Treatments and Procedures,” including the following:[36]
C. All Fallopian Tube and Ovarian Surgery with or without Hysterectomy, including Removal and Lysis of Adhesions.
1. injury to the bowel and/or bladder;
2. sterility;
3. ' failure to obtain fertility (if applicable);’
4. failure to obtain sterility (if applicable);
5. loss of ovarian functions or hormone production from ovary(ies);
|1fl6. injury to ureter;
7. injury to blood vessels, hemorrhage, need for transfusion of blood products;
8. failure to remove entire ovary possible requiring further surgery (ovarian remnant syndrome);
9. pulmonary embolism.
D. Abdominal Endoscopy (Peritoneos-copy, Laparoscopy).
1. puncture of the bowel or blood vessel;
2. abdominal infection and complications of infection;
3. abdominal incision and operation to correct injury;
4. injury to bladder;
5. injury to ureter;
6. possible air embolus.
The Consent Forms Signed by Ms. Fountain
It is uncontested that Ms. Fountain voluntarily gave her written consent for Dr. Bryan to perform a bilateral tubal ligation and ventral hernia repair and, the written consent form she admittedly signed informed her that the procedures included a “laparoscopic tubal ligation and ventral hernia repair.” As noted previously, the purpose of -the procedures was described on the form as follows: “to cut into my belly [to] destroy my tubes in an at *741 tempt to keep me from getting pregnant and also to repair the defect in my belly.” The form described the nature of Ms. Fountain’s condition for which the procedures were being recommended as | ^follows: “(1) Multiparity,[37] (2) Desires permanent sterilization, (3) Ventral hernia.” Further,, the form referred Ms. Fountain to the risks identified by the Panel for the surgical procedures she was undergoing — i.e., laparoscopic tubal ligation and ventral hernia repair — which were stated on the form as being provided in an attachment (“Attachment II”).[38] The consent form further listed the risks generally associated with the surgical treatment or procedures accompanied by anesthesia, to include: “death, brain damage, disfiguring scars, paralysis, the loss of or loss of function of body organs, the loss of function of any arm or leg,- infection, bleeding, and pain.” Several blanks, which were provided for remarks regarding additional risks (if any) particular .to Ms. Fountain “because of a complicating medical condition,” and for the listing of reasonable therapeutic alternatives and risks associated with those alternatives, were not filled in on the executed consent form. Also left blank on the form was the section provided for the doctor to identify any “[additional [r]isks” for the particular surgical procedures she was undergoing other than those identified by the Panel. Additionally, the consent form contained Dr, Bryan’s certification that he had provided and explained the information contained in the consent form and answered all of Ms. Fountain’s questions to the best of his knowledge and ability. Further, the consent forrh-'includ-ed language of acknowledgement by Ms. Fountain that she had read -’and uhder-stood all of the information contained in the form and that'alTápplicáble blanks had been filled in |¾1 prior to affixing her signature, agreeing that she had been provided an opportunity to discuss her surgical procedures — the laparoscopic tubal ligation and ventral hernia repair — -with her physician, that she had been provided an opportunity to ask questions, and that all of her questions were -answered' satisfactorily.
On appeal, Dr.. Bryan claims he informed Ms. Fountain of all risks associated with “tubal ligation,” encompassing not only tubal ligation by laparoscopy but also “tubal ligation by. laparotomy.” In addition, he claims he advised Ms. Fountain as to the general risks associated with surgery under general anesthesia, including “disfiguring scars.” By signing the consent form, Dr. Bryan therefore contends Ms. Fountain accepted all risks of scarring associated with surgery, whether by lapar-oscopy or laparotomy.[39] Consequently, *742 Dr. Bryan argues that because the forms Ms. Fountain acknowledges she signed were forms executed in accordance with the informed consent law disclosing the risks associated with the procedures as promulgated by the Panel pursuant to La. R.S. 40:1299.39.6,[40] which forms he contends (and Ms. Fountain vehemently denies) included the risks associated with a laparotomy (namely, disfiguring scars), he was presumed to have obtained proper informed consent from Ms. Fountain for the surgery in this case.[41] .
UaMs.- Fountain does not dispute that prior to surgery she signed the consent form aforedescribed, which expressly identified the surgical procedures she was undergoing as a “laparoscopic tubal ligation and ventral hernia repair.” She also does not dispute that she understood that following the minimally-invasive laparo-scopic surgery, a scar would remain on her abdomen — ie., a ' possible two-inch scar as described to her by Dr. Bryan. Ms. Fountain argues that, under the informed consent statute, and the specific consent form she signed, the form is a disclosure only for the risks of scarring associated with the minimally invasive surgery identified on the form to which she consented; that is, laparoscopic surgery. Nonetheless, it is undeniable that Dr. Bryan performed an altogether different surgery — a tubal ligation by laparoto-my, which actually involved cutting directly through her abdominal wall — to which she claims — and the jury apparently believed — she did not give her’ consent. We agree.
In this case, despite Dr. Bryan’s testimony to the contrary, the consent form signed by Ms. Fountain evidences her consent only to the procedures identified: la-paroscopic tubal ligation and ventral hernia repair. Consequently, her acceptance of the risks of scarring were the material risks of scarring associated only with that laparoscopic procedure. And though Dr. Bryan contends he disclosed the risks of laparotomy to Ms/ Fountain (presumably by 'circling sections “C”-and “D” on Attachment II of the consent form), “laparot-omy” is not mentioned anywhere on l^the form, nor does the form seek Ms. Fountain’s consent for or alert-her to the risks of scarring associated with that particular surgical procedure; At trial, Ms. Fountain denied ever having received Attachment II.[42] Further, she denied that Dr. Bryan *743 discussed with her his performing the tubal ligation by laparotomy, thereby depriving her of the opportunity to ask questions concerning the risks associated with that surgical procedure. It was undisputed at trial that the risk of scarring associated with laparotomy is greater than the risk of scarring associated with the minimally invasive laparoscopic procedure, which typically involves two. to three puncture wounds. Ms. Fountain testified, and the jury believed, that had Dr. Bryan sought her consent to perform the contemplated procedures by laparotomy, thereby subjecting her to the risk of greater scarring, which she specifically told him she was trying to avoid, she would never have given her consent to the surgery.
Our review of the record in this case reveals that ample evidence was presented upon which the jury could have reasonably found that Dr. Bryan never initiated Ms. Fountain’s surgery laparoscopically and, further, that he failed to obtain the proper informed consent from Ms. Fountain for the laparotomy he actually performed. Because a reasonable factual basis exists for the jury’s findings, the jury’s verdict is not manifestly erroneous or clearly wrong. Accordingly, we find the various assignments of error asserted by Dr. Bryan relating to the issue of informed consent lack merit.
1 graving determined that the presumption of informed consent does not apply, in accordance with the informed consent statute, this case is “subject to proof according to the rules of evidence in ordinary cases.” See La. R.S. 40:1299.40 C.[43] Applying the ordinary rules of evidence herein, we do not find the jury was manifestly erroneous or clearly wrong in concluding that Dr. Bryan did not disclose to Ms. Fountain the material risk of disfiguring scars associated with undergoing the laparotomy he actually performed. The trial testimony established that what Ms. Fountain understood and expected was the risk of & scar from the “relatively small” incision typically incurred during a lapar-oscopy. The testimony of Kristy Fau-cheaux, the holding nurse for Ms. Fountain on the day of her surgery,[44] confirmed that a laparoscopy is a minimally invasive surgical technique used in procedures such as a tubal ligation wherein a trocar instrument is used to place two to three punctures, or small cuts, into the abdomen (“or whatever you’re doing the surgery on”), in which the instruments to perform the surgery are inserted. Conversely, she testified that a laparotomy involves an actual incision through the abdominal wall.
The plaintiffs expert, Dr. Edward Koch, a board certified obstetrician/ gynecologist from McLean, Virginia, explained to the jury that the risks associated with a lapar-oscopy and a laparotomy differ as they are two different surgical procedures involving the use of different surgical instruments.[45] *744 He further | ar,explained that the size of the incision a physician makes to accomplish a particular surgical procedure is in direct correlation to the size of the scar that will be left behind. For example, he testified that in his experience, when ■ a surgeon makes a two-inch incision, the patient -is left with a two-inch scar, and .similarly,-‘a ten-inch incision results in a ten-inch scar, et cetera. The record. confirms that instead of using , the trocar to make, the small, puncture-like incisions Ms., Fountain was told she could .and should expect from a. laparoscopy; Dr. -Bryan proceeded with performing a laparotomy by using a sharp knife to make a 15-centimeter incision through the abdominal wall, .resulting in a 15-eentimefer T-shaped permanent scar on her abdomen. . .This is the surgery Dr. Bryan, originally scheduled with the hospital for Ms. Fountain,, and this. is the surgery he ultimately performed — without her consent to do so.
• Our review of the appellate record leads us to conclude that the jury’s factual- finding that Dr. Bryan failed'to disclose to Ms. Fountain the risk of scarring associated with the laparotomy he performed and that such a risk was material is supported by the evidence .admitted at trial. Accordingly, we, hold the jury was not manifestly erroneous or clearly wrong in finding Dr. Bryan liable to Ms. Fountain for subjecting her to, the risk of a disfiguring scar from a laparotomy performed without her consent.
In his last assignment of error, Dr. Bryan avers that the jury manifestly erred in “finding that Ms. Fountain’s lack of consent to tubal ligation with laparoto-my was the cause-in-fact of’ her disfiguring scar on the basis that Ms. Fountain lacked the requisite expert testimony to prove this element of her case. Specifically,disaccording to Dr. Bryan, while Dr. Koch testified that the “care given to Ms. Fountain contributed to her large scar,” he “never opined that but for the switch in tubal ligation procedure, [Ms.] Fountain would not have. sustained such a. large scar.” We disagree.
Our review of the record indicates that both Dr. Koch and Dr. Bryan testified that the T-sháped scar Ms. Fountain sustained was a result of the incision Dr. Bryan made when he performed the tubal ligation and ventral hernia repair by laparotomy. Specifically, under cross-examination Dr. Bryan testified:
Q. Okay. But what she actually got, as written in your operative report, what she actually got was a mini laparotomy. And the scars that we’ve talked about that are on her stomach are all as a result of her having a mini laparotomy and lapa-rotomy for the ventral hernia repair, correct?
A. That’s correct.
And Dr. Koch testified as follows:
A. It directly is a cause of her scar. Whatever happened during the surgery, which is totally' unexpected, has left her with quite a disfiguring scar, much different than the small incision that he described [to] her in her appointment were she agreed to having her tubal ligation and ventral hernia repaired originally.
Dr. Bryan’s argument appears to presuppose that the jury believed his testimony that he began Ms. Fountain’s surgery laparoscopically and, due. to unexpected circumstances and for her safety," had to *745 convert the procedure to a laparotomy necessitating the larger-than-anticipated scar. In other words, because' of the difficulties he encountered with the protruding peritoneum and intestines during surgery, regardless of whether or not he initiated the surgery laparoscopically, he would have had to make the same large scar so that he could | ^successfully address those difficulties. Unfortunately for Dr, Bryan, the jury was presented with this factual argument and, confronted with conflicting evidence, rejected it. The record contains ample evidence supporting the jury’s decision to do so. Specifically, Dr. Bryan’s operative report completed within hours of Ms. Fountain’s surgery failed to list any difficulties encountered during surgery and he, expressly noted in his narrative that “[tjhere were no intraoperative complications.”
In light of the record before us, we find the jury’s choice was reasonable and supported by the evidence. This assignment of error also lacks merit.
CONCLUSION
For the foregoing reasons, finding the jury’s verdict is supported by the record evidence, and thus, is not manifestly erroneous or clearly wrong, we affirm.

AFFIRMED.

. Ms. Fountain also named as a defendant, Ochsner Foundation Clinic Westbank Campus, alleging medical malpractice. At trial, the jury exonerated the hospital and that finding has not been challenged on appeal.

. Dr. Bryan testified that Ms. Fountain was presented with a consent form mandated by the state, which she signed, and that she delayed making a final .decision to undergo permanent sterilization for the time period required under state law.

. The CT scan performed on 6 July 2009, confirmed the presence of "a small fat-containing ventral hernia in [Ms. Fountain's] left paramidline abdomen several centimeters above the umbilicus [navel] with the defect measuring only 5 [millimeters] - or so in width and the hernia sac measuring approximately 2,0 x 1.3 [centimeters].”

.Laparotomy and laparoscopy are two separate and distinct approaches to abdominal surgery. Laparoscopy is a minimally invasive surgery, which requires special equipment and a high resolution display device to visualize (rather than expose) the intra-abdominal contents during surgery. Conversely, laparot-omy it the cutting open of the abdominal *732 cavity, exposing the intra-abdominal content, to get at the organ requiring the surgical procedure. While laparoscopy requires only a small port of entry, laparotomy actually opens up the abdomen exposing its content. Additionally the recovery time after laparos-copy is generally shorter than that after lapa-rotomy.

,The patient consent form Ms. Fountain executed on 6 August 2009 contains no reference tp a "mini laparotomy,” which, according to the medical records and Dr. Bryan’s own testimony, is the procedure he previously scheduled for her in June.

. The' trial testimony and photographs entered into evidence confirm the existence of the large, disfiguring scar described by Ms. Fountain.

. “Herniorrhaphy” refers to the surgical repair of a hernia. .

. See Footnote 1, supra.

. In essence, while the medical review panel concluded that Dr. Bryan failed to obtain Ms. Fountain’s informed consent for the laparoto-my, because the laparotomy performed was done properly and the post-operative management was appropriate, the panel determined that the lack of informed consent did not give rise to any-injury to Ms, Fountain. ■

. For reasons unexplained, the members of the medical review panel never received, and therefore never reviewed or considered, Dr. Bryan’s supplemental submission and request for reconsideration.

. See Footnote 1, supra.

. The "umbilicus” is also known as the navel.

. The "peritoneum” is the serous (thin and watery, like serum)- membrane lining the : walls ’ of ‘.the abdominal and pelvic cavities.

, See Footnote 7, supra.

. A "trocar” is a surgical instrument with a ■ three-sided cutting point enclosed in a tube that is used to puncture the wall of a body cavity to provide an access port for the subsequent placement of other instruments during laparoscopic surgery. See Mosby’s Medical Dictionary, "trocar,” 9th edition, 2009.

. It is apparent from our review pf the, rec- ' ord that the cá'se before the jury hinged on Dr. Bryan’s credibility and the jury's determination of whether or not he was telling the truth about initiating Ms, Fountain’s surgery laparoscopically, and only thereafter, for her safety, converted to laparotomy. Based upon their responses to the jury interrogatories and the resulting verdict, it is obvious that the jury did not find Dr. Bryan’s testimony credible.

. .La, R.S. 40:1299.39.5 was redesignated as La. R.S. 40:1157.1 by. H.C.R, No. 84 of the 2015 Regular Session (hereinafter referred to in other footnotes as "HCR 84”).

. La. R.S.40:1299.40 was amended by La. Acts 2012, No. 759, §' 2, effective 12 June 2012; to consist of La. R.S. 40:1299.39.5 to 40:1299.39.7. Section 3 of Act 759 repealed La. R.S. 40.1299,40. The repealing Act revised Part XXII, “Uniform Consent Law” of Chapter ’5 of Title 40 of the Louisiana Revised Statutes. The. general subject matter of Part XXII remained unchanged. Thereafter, La, R.S. 40:1299,39.5, 40:1299.39.6, and 40:1299.39.7 were redesignated as La. R.S. 40:1157.1, 40:1157:2, and 40:1157.3, respectively, by HCR 84, effective 2 June 2015.

.By La. Acts 2012, No. 759, § 2, La. R.S. 40:1299.40 E(2)(a) was amended and became La. R.S.- 40:1299.39.5 D (currently La.- R.S. 40:1157.1 D). . ’

. The 1990 amendment, specifically La. R.S. 40:1299.40 E(3)(a) (currently La. R.S. 40:1157,2), created the Louisiana Medical Disclosure Panel and charged it with determining which risks and hazards related to medical care and surgical procedures must be disclosed by a physician to a patient, and establishing the general form and substance . of such disclosure.

. The substance of former La. R.S. 40:1299.40 E(2)(b) now appears in La. R.S. 40:1157.1 E (redesignated' from R.S. 40:1299.39.5 E).

. The substance of former La. R.S. 40:1299.40 A(l) now appears in La. R.S. 40:1157,1 A (redesignated from R.S. 40:1299.39.5 A).

. In addition to other revisions to the statute, the phrase “handwritten consent” was deleted from former La. R.S. 40:1299.40 A(l) by 2008 La. Acts, No. 738, § 1, effective 3 *738 July 2008, and was replaced with "the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.” The substance of La. R.S. 40:1299.40 A(l), as amended in 2008, now appears in La. R.S. 40:1157.1 A (redesignated from La. R.S. 40:1299.39.5 A).

.The substance of former La. R.S. 40:1299.40 .C now appears in La. R.S. 40:1157.1 C (redesignated from R.S. 40:1299.39.5 C).

. The substance of former La. R.S. 40:1299.40 E(3)(a) now appears in La. R.S. 40:1157.2 B(l) (redesignated from La. R.S.40:1299.39.6 B(l)).

. The substance of former La. R.S. 40:1299.40 E(4)(a) and (b) now appears in La. R.S. 40:1157.2 J(l) and (2) (redesignated from La. R.S.40:1299.39.6(J)(1) and (2)).

. The substance of former La. R.S. 40:1299.40 E(4)(c) now appears in La. R.S. 40:1157.2 J(3) (redesignated from. R.S.40:1299.39.6 J(3)).

. The substance of former La. R.S. 40:1299.40 E(5) now appears in La. R.S. 40:1157.2 M (redesignated from La. R.S. 40:1299.39.6 M).

. See Footnote 28, supra.

. The substance of former La. R.S. 40:1299.40 'E(6) now appears in La. R.S. 40:1157.2 N (redesignated from La. R.S. 40:1299.39.6 N).

. The substance of former La. R.S. 40:1299.40 E(7)(b) now appears in La. R.S. 40:1157.2 0(2) (redesignated from La. R.S. 40:1299.39.6 0(2)).

. The substance of former La. R.S. 40:1299.40 E(7)(c) now appears in La. R.S. 40:1157.2 P (redesignated from R.S.40:1299.39,6 P).

. The substance of former La. R.S. 40:1299.40 E(7)(a)(i) now appears in La. R.S. 40:1157.2 0(l)(a) (redesignated from La. R.S.40:1299.39.6 0(1 )(a)).

. The substance of former La. R.S. 40:1299.40 E(7)(a)(ii) now appears in La. R.S. 40:1157.2 0(l)(b) ‘ (redesignated from La. R.S.40:1299.39.6 0(l)(b)). ' '

. The term "[e]mergency services” is defined by La. R.S. 40:2113.6 C as meaning "services ... that must be provided immediately to stabilize a medical condition which, if not stabilized, could reasonably be expected to result in the loss of the person’s life, serious permanent disfigurement or loss or impairment of the function of a bodily member or organ, or which is necessary to provide’ for the care of a woman in active labor if 'the hospital is so equipped and, if the hospital is not equipped, to provide necessary treatment to allow the woman to travel to allow the woman to a more appropriate facility without undue risk of serious harm.”

.Section 4 of 2012 La. Acts, No, 759, declared that all existing medical disclosure lists duly promulgated by either a prior Panel or by the Department of Health and Hospitals Secretary would remain effective and would be deemed to have been promulgated by the newly-created Panel until such time as those lists could be updated and re-promulgated pursuant to the provisions of Act 759.

. “Multiparity” is the status of a mother of more than one child.

. Attachment II, captioned "Patient Consent to Medical Treatment, Surgical Procedure and Acknowledgement, Receipt of Medical Information,” lists the risks identified by the Panel in 48 La. Admin. . Code, pt. 1 § 2303 as being associated with “Female Genital System Treatments and Procedures.” Circled on the form Dr. Bryan contends he gave to Ms. Fountain were items "C. All fallopian tube and ovarian surgery with or without hysterec- ■ tomy, including removal and, lysis of adhe-sions” and "D. Abdominal endoscopy (perito-neoscopy, laparoscopy).”. The.specific risks identified in "C” and "D” are listed, above. Notably, neither "C” or "D” even discuss scarring risks. Moreover, at trial, Ms, Fountain denied ever having received Attachment II.

.■ At trial, Dr. Biyan testified that he was of the belief that the consent form Ms. Fountain signed gave him the authority to attempt to perform the identified procedures laparoscop-ically, but that, if necessary .for her safety, that authority, extended to allow him to convert the procedure to an "open procedure or a laparotomy." He. further testified that every single consent form, including the one executed by Ms. Fountain, includes, the possibility of • a laparotomy,in the.event it is not possible to continue the surgery laparoscopically, both of *742 which carry with them the risk of disfiguring scars.

. La. R.S. 40:1299.36 now appears in La. R.S. 40:1157.2, redesignated by HCR 84.

. Dr. Bryan testified at trial that in Ms. Fountain's case, while the plan was for him to proceed with a laparoscopic approach for the tubal ligation, it was never his intention to complete the ventral hernia repair laparo-scopically; as he was not certified or authorized to perform laparoscopic hernia surgery. (Dr. Bryan testified that in 2009, most all hernia repair surgeries were performed with laparotomy.) Specifically, Dr. Bryan testified that it was always his intent to attempt to do the tubal ligation laparoscopically and then proceed through the same incision to complete the ventral hernia repair by laparotomy, thereby resulting in only the one scar Ms. Fountain said she wanted. Dr. Bryan claims he advised Ms. Fountain- of this "plan” and that this is what she agreed to when she signed the consent form on 6 August 2009. Conversely, Ms, Fountain testified that in the 6 August 2009 pre-operative consultation, Dr. Bryan told her that he could perform both elective procedures laparoscopically through a relatively small incision and that he never even discussed with her the possibility of performing a-mini laparotomy (which requires cutting through, opening up, and exposing the abdominal cavity), to accomplish either the tubal ligation or the ventral hernia repair.

. As noted supra, pursuant to former La. R.S. -40:1299.40 E(7)(c)(v), the substance of which now appears in La. R.S. 40:1157.2 P(5) (redesignated from La. R.S. 40:1299.39.6 P(5)), Sections "C" and "D” of Attachment II *743 have force only if the physician "[p]rovide[s] an opportunity to ask any questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge^] in writing that he answered such questions, to the patient_” (Emphasis supplied.) Dr. Bryan did not perform the "contemplated ... surgical procedure,” i.e., laparoscopy.

.Pursuant to former La, R.S. 40:1299.40 C, the substance of which now appears in La. R.S. 40:1157.1 C (redesignated from La. R.S. 40:1299.39.5 C), claims of consent outside the scope of any presumption are controlled by the ordinary rules of evidence,

. Ms. Faucheaux testified that, as Ms. Fountain's holding nurse, she was responsible for and did present her with a number of consent forms, in addition to information contained in the hospital’s computer, identifying the procedure that was going to take place.

. According to Dr. Koch, his review of the medical records suggested to him that the surgical instruments generally associated with *744 performing a laparoscopic surgery were not present in Ms-, Fountain's operating room, indicating to him that the laparoscopic procedure she consented to wasj never started and that Dr. Bryan started the procedure with making an incision directly into Ms. Fountain’s abdomen.