NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-929

TREMIA WILLIAMS

VERSUS

CEQUEL III COMMUNICATIONS, I, LLC, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-841
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, D. Kent Savoie, and Billy H. Ezell, Judges.

Thibodeaux, Chief Judge, dissents and assigns written reasons.

Cooks, J., dissents for the reasons assigned by Judge Thibodeaux.

AFFIRMED.

**Andrew D. Weinstock**
**Duplass, Zwain, Bourgeois, Pfister & Weinstock**
**3838 N. Causeway Boulevard, Suite 2900**
**Metairie, LA 70002**
**(504) 832-3700**
**COUNSEL FOR DEFENDANTS-APPELLEES:**
    **Marvin Gainous**
    **Cequel III Communications, I, LLC**
    **Liberty Mutual Fire & Casualty Insurance Company**


**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF-APPELLANT:**
    **Tremia Williams**

**PICKETT, Judge.**

The plaintiff appeals the jury's determination that she did not sustain damages as a result of the collision at issue in this litigation. After reviewing the record and the parties' arguments, we affirm the jury's verdict.

**FACTS**

On March 4, 2013, Marvin Gainous was stopped at a stop sign behind a car driven by Tremia Williams when his foot slipped off of the brake of the truck he was driving which caused the truck to move forward and strike the rear of Ms. Williams' car. Mr. Gainous, an employee of Cequel III Communications, I, LLC, was in the course and scope of his employment when the collision occurred. Ms. Williams sued Mr. Gainous; Cequel; Liberty Mutual Fire Insurance Company, Cequel's insurer; and USAgencies Casualty Insurance Company, her uninsured/underinsured insurer, seeking to recover damages for injuries she allegedly suffered as a result of the collision.

At trial, Ms. Williams testified that she was stopped, waiting to make a left turn, when the collision occurred and that immediately after the collision, her head, neck, and left shoulder started hurting. She further testified that Mr. Gainous approached her and asked if she was "okay" to which she answered, "No." Mr. Gainous then walked away, and she called the police and an ambulance.

Mr. Gainous admitted that the collision was his fault but disputed that Ms. Williams answered "No" when he asked if her if she was okay. He testified that he asked her if she was "okay," and she replied, "Yeah, I'm okay." Mr. Gainous further testified that he returned to his vehicle and called his supervisor to report the collision. At that time, he noticed Ms. Williams talking on her cell phone; shortly thereafter, a police officer and an ambulance arrived.

Ms. Williams was transported by the ambulance to the emergency room at Lake Charles Memorial Hospital. She complained of pain in her left shoulder and back and of having a headache. She was given a morphine shot and prescribed a muscle relaxer and pain medication. X-rays of her cervical and lumbar spines taken that day were interpreted by the radiologist as normal.

Ms. Williams testified that prior to the collision, she had suffered headaches and pain in her neck and back following other accidents in which she had been involved, but the pain lasted only a short time after each of those accidents. She explained that she was first injured in 2006 when the car in which she was a passenger was rear ended. She sought treatment at an emergency room and was diagnosed with a whiplash injury. Ms. Williams next reported that she was injured again in 2011 while driving her car, when the axle on the car broke and caused her car to leave the roadway and hit a tree. She sought treatment at the emergency room the day after that incident because of pain in her neck and back. Later in 2011, she was injured, while working as a certified nurse's assistant, when she was assisting a patient who pulled against her as she tried to help the patient get up. Her supervisor instructed her to seek treatment at the emergency room. She was prescribed pain medication and put on light duty for a few days after which she was released to return to her usual work duties. On at least one occasion, Ms. Williams sought treatment for a headache, which she related to sinus pressure. She explained that no testing was performed in connection with any of these incidents, she received medical treatment only once after each incident at the emergency room, and all her complaints resolved without additional treatment.

Ms. Williams also related that she had had back pain in 2012 while pregnant. She testified that she continued to have back pain until her baby was born in

December 2012. In 2014, Ms. Williams sought treatment at an emergency room and received stitches for a cut on her face that she testified occurred when her cousin opened a kitchen cabinet door that hit her face.

Ms. Williams testified that on March 7, 2013, she sought treatment from Dr. Joshua Thomas, a chiropractor, because she continued to have headaches and pain in her neck and back. She continued treatment with Dr. Thomas through March 2014. Dr. Thomas' treatment consisted of massage and electrical modalities. Initially, Ms. Williams regularly sought treatment with Dr. Thomas, but her treatments tapered off over time. She saw him three times in August 2013 then did not see him again until March 2014, when she saw him twice. Her last visit to Dr. Thomas was March 21, 2014.

Ms. Williams also sought treatment with Dr. Thomas W. Axelrad, an orthopedic surgeon, for the same complaints of left shoulder pain, neck and back pain, and headaches. She first saw Dr. Axelrad on April 9, 2013. He noted her complaints and that X-rays taken that day showed a loss of lordosis of her cervical spine that is consistent with muscle spasm. Dr. Axelrad ordered MRIs of her neck and back. Ms. Williams returned to Dr. Axelrad on May 14, 2013. After reviewing the test results, he noted the MRIs indicated potential disc pathology in Ms. Williams' neck and back and referred Ms. Williams to Dr. Gregory Rubino, a neurosurgeon, for further consultation.

On May 20, 2013, before seeing Dr. Rubino, Ms. Williams again sought treatment at the emergency room, complaining of continued pain in her neck and back. She reported that she had seen Dr. Axelrad and been referred to Dr. Rubino, but that Dr. Axelrad had not prescribed her any pain medication. She was prescribed pain medication on that date. Thereafter, on June 5, Ms. Williams saw

3

Dr. Rubino. He reviewed her complaints and prior testing and prescribed pain medication and physical therapy. Ms. Williams attended only four of the prescribed twenty-four physical therapy sessions. She explained at trial that she could not afford to miss work to attend the physical therapy sessions three times a week as prescribed by Dr. Rubino and that the physical therapy and home exercises recommended by the physical therapist caused her more pain, so she did not do them as prescribed. After noting that the physical therapy did not provide Ms. Williams any pain relief, Dr. Rubino referred her to Dr. Seth Billiodeaux, an anesthesiologist with a subspecialty in pain management. Dr. Rubino's notes indicate he was unaware that Ms. Williams did not attend all of the physical therapy sessions he had prescribed.

After reviewing Ms. Williams' history and her tests, Dr. Billiodeaux performed two epidural injections on Ms. Williams: one in her neck and one in her back. Ms. Williams testified that the injections provided her some pain relief for one week. Dr. Billiodeaux explained at trial that the injections served two purposes. First, they ruled out that the pain in her neck and back originated from disc in either her neck or back. Second, they established that further investigation was warranted to determine the cause of her pain. The epidural injections did not provide Ms. Williams any lasting pain relief, which Dr. Billiodeaux explained ruled out her neck and back pain originating from a disc protrusion. Dr. Billiodeaux had no other treatment to offer Ms. Williams, and he referred her back to Dr. Rubino, who then referred her to another chiropractor, Dr. J. Steven Caraway.

4

Ms. Williams sought treatment from Dr. Caraway a total of nine times in February and March 2015. She testified that the treatment he provided was similar to the treatment Dr. Thomas had provided her and that it did not alleviate her pain.

On March 18, 2016, Dr. Neil Romero, an orthopedic surgeon, performed an independent medical exam on Ms. Williams at the defendants' request. Dr. Romero testified at trial via video deposition that Ms. Williams' complaints to him were completely subjective and that her complaints of neck pain were neither consistent with nor inconsistent with the MRI of her neck. In his opinion, the MRIs of her neck and back could have been of "someone completely asymptomatic." Nevertheless, Dr. Romero opined that Ms. Williams suffered a cervical strain and lumbar strain as a result of the collision and that she would benefit from physical therapy. He stated that his opinion was based on subjective complaints because there was no objective evidence substantiating her complaints.

Dr. Romero explained that a number of factors led to his diagnosis: Ms. Williams' complaints had been consistent since the collision; her complaints were not inconsistent with his examination; the collision apparently flared up symptoms she had previously experienced on a few occasions; neither her history nor her complaints indicated to him that she was malingering; he found no reason to doubt her complaints; and because there were no objective findings, he relied on her subjective complaints which is often the case with injuries like the ones complained of by Ms. Williams. Dr. Romero observed in his report that although Ms. Williams denied having any previous back or neck injuries at the examination, his review of her medical records revealed the injuries previously outlined.

The defendants presented the testimony of Officer Cheryl Leichliter of the Lake Charles Police Department who investigated the collision. Officer Leichliter

5

testified that no damage occurred when Mr. Gainous' truck struck Ms. Williams' car. She inspected the two vehicles and found that the impact only caused a transfer of dust from the rear bumper of Ms. Williams' car to the front bumper of Mr. Gainous' truck. Officer Leichliter did not issue Mr. Gainous a citation.

The defendants introduced the data gathered from the Airbag Control Module of Mr. Gainous' truck which revealed that the collision did not register on the module. Evidence established that this module only registers impacts of three miles per hour or greater; therefore, it established that the truck was traveling at three miles per hour or less when it struck Ms. Williams' car.

The defendants argued to the jury that although Mr. Gainous was negligent, Ms. Williams had not proven that the minor collision caused her any injury. Highlighting Ms. Williams' prior complaints of headaches and neck and back pain, the minimal impact of Mr. Gainous' truck on Ms. Williams' car, Ms. Williams' failure to inform her doctors of her prior history of neck and back pain, and her failure to complete the physical therapy ordered by Dr. Rubino, the defendants questioned Ms. Williams' credibility and argued that because her complaints were subjective only, she failed to prove the collision caused her any injury.

The jury concluded that Mr. Gainous was negligent but that his negligence did not cause injury to Ms. Williams. Ms. Williams assigns two errors with the jury's verdict which present these issues for our consideration: 1) did the collision cause her injury and 2) did she suffer damages as result of her injury.

## DISCUSSION

*Causation*

Ms. Williams argues that the jury erred in finding that she was not injured in the collision. "Whether an accident caused a person's injuries is a question of fact

which should not be reversed on appeal absent manifest error." *Housley v. Cerise*, 579 So.2d 973, 979 (La.1991) (citing *Mart v. Hill*, 505 So.2d 1120 (La.1987)). Under this standard of review, an appellate court cannot reverse a trial court's finding of fact unless the record shows the finding is manifestly erroneous or "clearly wrong." *Snider v. Louisiana Med. Mut. Ins. Co.*, 13-579 (La. 12/10/13), 130 So.3d 922, 938. To reverse a factfinder's determination, an appellate court must review the record and find that: (1) "a reasonable factual basis does not exist for the finding of [fact]," and (2) "the record establishes that the finding is clearly wrong (manifestly erroneous)." *Id.* (quoting *Stobart v. State*, *Dep't Transp. & Dev.*, 617 So.2d 880, 882 (La.1993)). Accordingly, an appellate court reviews the record to determine whether the factfinder's conclusion was reasonable, not whether it was right or wrong. *Id.*

Under the manifest error standard of review, findings of fact based on credibility determinations must be given "great deference." *Id.* Moreover, "[w]here the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Id.* This rule applies to the evaluation of lay testimony and to the evaluation of expert testimony, "including the evaluation and resolution of conflicts in expert testimony." *Id.* at 939.

In *Mart*, 505 So.2d at 1127, the supreme court explained, however, that this standard of review does not require an appellate court "to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles."

7

Ms. Williams had the burden of proving that she was injured as a result of Mr. Gainous' negligence by a preponderance of the evidence. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. She had to prove "through medical testimony that it is more probable than not that [her] subsequent injuries were caused by" Mr. Gainous' negligence. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615, p. 3 (La. 2/20/95), 650 So.2d 757, 759. The fact that Ms. Williams had a pre-existing injury or condition does not prevent her from recovering damages for additional injury similar to or aggravation of that pre-existing condition if she proved the defendant's negligence caused the additional injury and/or aggravation. *Lasha v. Olin Corp.*, 625 So.2d 1002 (La.1993).

In cases such as this one where a collision is at issue, the force of the collision may be considered with respect to whether the collision caused an injury; however, it is only one fact to be considered when determining whether the plaintiff was injured or the extent of the injury. *Brown v. Trinity Universal Ins. Co.*, 01-1405 (La.App. 3 Cir. 4/3/02), 814 So.2d 747, *writ denied*, 02-1689 (La. 10/14/02), 827 So.2d 422. When considering the plaintiff's claims, "[u]ncontroverted evidence should be taken as true to establish a fact for which it is offered absent any circumstances in the record casting suspicion as to the reliability of this evidence and sound reason for its rejection." *Guidry v. Lafayette Health Ventures, Inc.*, 15-307, p. 7 (La.App. 3 Cir. 7/20/16), 203 So.3d 436, 440, *writ denied*, 16-1643 (La. 11/18/16) (quoting *Boxie v. Smith-Ruffin*, 07-264, p. 7 (La.App. 5 Cir. 2/6/08), 979 So.2d 539, 545).

Ms. Williams argues that her medical evidence establishes that although she had prior complaints of headaches, neck and back pain, her complaints after the collision were caused by the collision. Dr. Billiodeaux testified that the scoliosis

of her spine may have predisposed Ms. Williams to back and neck injury, such that even a minimal impact like the one at issue herein would cause her injury but would be unlikely to cause injury to others without scoliosis. He further testified that the natural curvature of Ms. Williams' cervical spine was an objective finding that substantiated her complaints of neck pain. Dr. Romero accepted Ms. Williams' subjective complaints of pain as true and opined that she more probably than not suffered a cervical and lumbar strain as a result of the collision.

The defendants countered Ms. Williams' evidence regarding her injuries, causation, and damages with her actions, her medical evidence, Mr. Gainous' testimony, and the physical evidence surrounding the collision. They began by challenging her testimony that she answered "No" when Mr. Gainous asked her if she was "okay" after the collision, countering with Mr. Gainous' testimony that she responded, "Yeah, I'm okay." Additionally, although she told Mr. Gainous that she was not injured, Ms. Williams immediately called the police and an ambulance after he walked back to his truck.

The defendants next established that Ms. Williams did not report her prior complaints of headaches and neck and back pain to any of her doctors after the collision. Ms. Williams testified that she saw Dr. Thomas "for a while, a few weeks," but Dr. Thomas' records show that she sought treatment from him fairly regularly from March 2013 through July 2013, during the same time that she sought treatment from Dr. Axelrad and Dr. Rubino and had been prescribed physical therapy. Despite her extended treatment with Dr. Thomas, Ms. Williams did not report her treatment with him to her other doctors. Additionally, the defendants showed that Ms. Williams did not list Dr. Thomas as one of her treating physicians when she responded to interrogatories that they propounded. Ms.

Williams addressed this issue at trial, explaining that she listed him on her handwritten answers, but she did not type the responses submitted to the defendants. Consequently, she had no way of knowing that Dr. Thomas was not included in the responses provided to the defendants. Ms. Williams further explained that she identified Dr. Thomas when the defendants took her deposition.

Ms. Williams testified at trial that she could not take the pain medication prescribed by her doctors because it made her too sleepy to work and/or care for her children, but the records from her May 2013 emergency room visit established that the reason for her visit was to obtain pain medication. Ms. Williams also testified that she could not attend physical therapy three times a week as prescribed by Dr. Rubino because she could not afford to miss work that often. On cross-examination, the defendants established that during that same period of time, she regularly attended treatment with Dr. Thomas. Additionally, his records reflect that she was improving under his treatment, yet, she consistently reported to the physical therapist and her doctors that her pain was not improving. Ms. Williams denied reporting improvement to Dr. Thomas but could not explain why he noted that she reported improvement on seven occasions.

Defense counsel further established that Ms. Williams attended physical therapy on June 24, 2013, and reported her pain as a nine on a scale of one to ten, but she received treatment from Dr. Thomas the next day and, according to his records, reported improvement. Ms. Williams continued to report improvement to Dr. Thomas through her last visit with him in March 2014. In contrast, she attended only four of the prescribed physical therapy sessions on June 24, June 28, August 8, and August 28, 2013. Her complaints on these four dates were essentially the same, and she never indicated any improvement.

The defendants also challenged Ms. Williams' medical evidence. X-rays taken the day of the collision were considered normal by by Dr. Romero and the radiologist who interpreted them. Dr. Romero contradicted Dr. Billiodeaux's testimony that Ms. Williams' test results revealed objective findings for complaints of neck pain, testifying that all Ms. Williams' tests were negative and did not reveal any objective findings substantiating her complaints of pain.

The defendants also challenged Ms. Williams' credibility regarding the back pain she complained of while pregnant in 2012. Her obstetrician ordered physical therapy; however, she only attended two sessions, one in May and one in June. She was discharged in August 2012 because she no longer reported for her appointments. Contrary to Ms. Williams' testimony that her back pain was relieved when she delivered her baby, the defendants argued that the physical therapy must have relieved her back pain.

Dr. Billiodeaux and Dr. Romero accepted Ms. Williams' history and complaints as true because they found no reason to suspect her truthfulness. The jury, however, was shown contradictory evidence not known by these doctors. It was the jury's duty to weigh the evidence and the credibility of the witnesses. After considering these factors, the jury apparently questioned Ms. Williams' credibility and discounted her testimony that she was injured as a result of the collision. The record does not show that this finding is clearly wrong. Unlike, *Mart*, 505 So.2d 1120, the record here provided the jury with contradictory medical testimony and evidence that established a sound reason for its rejection of Ms. Williams' claims; this factual finding does not contravene applicable legal principles.

11

For these reasons, the jury's finding that Mr. Gainous' negligence did not cause Ms. Williams injury is affirmed. Having affirmed the jury's verdict, we need not address Ms. Williams' second assignment of error.

## DISPOSITON

The judgment of the trial court is affirmed. All costs are assessed to Tremia Williams.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

TREMIA WILLIAMS

VERSUS

CEQUEL III COMMUNICATIONS, I, LLC, ET AL.

**THIBODEAUX, Chief Judge, dissenting.**

The majority fails to acknowledge or ignores record evidence.

It is undisputed that both Dr. Romero, the defendant's expert, and Dr. Billiodeaux, plaintiff's expert, agreed that Ms. Williams had a cervical and lumbar strain. Dr. Romero even commented she would benefit from additional therapy. I am mindful that Dr. Romero opined that his treatment recommendation was based on the plaintiff's subjective complaints. However, he concluded that he had no reason to question her complaints, and that she was not malingering.

During his direct examination, Dr. Billiodeaux was asked to compare the MRI of the plaintiff compared to the subjective complaints made at her first visit. Dr. Billiodeaux, in commenting on the MRI, said:

> A    It legitimizes her complaints. Now, I'm not going to say everyone comes in with disc bulges on MRIs is going to be a pathological findings. I mean it could be a normal finding, but it did substantiate some of her complaints and it needed further medical investigation.

When he was asked to compare the image of the plaintiff's neck to one that was taken six weeks later, he commented that "[it]'s not what you would expect to see with a normal image of the neck.

> Q    And what do these images tell you, Doctor, about her neck?"

His response was:

A    That's usually an indication of cervical muscle spasms. The muscles are tightening up in the neck because there's been a sprain or some type of injury and the muscles tighten up. It also straightens the curvature of the spine. So that's why we see those objective findings of a straight cervical spine versus a normal curvature.

Q    So, for someone to say there was no objective evidence of injury, that's incorrect based on these images?

A    Correct.

Dr. Billiodeaux went on to testify that the fact that the plaintiff was still having problems three years after the accident is out of the norm for most people. However, Ms. Williams's predisposing factors provided a reasonable explanation for this observation. Dr. Billiodeaux agreed with Dr. Romero that Ms. Williams would benefit from additional therapy even three years after the accident.

The salient point is that both medical providers had no reason to question Ms. Williams's subjective complaints. Further, there was objective evidence to buttress those subjective complaints. *Mart v. Hill*, 505 So.2d 1120 (La.1987), concluded that an appellate court does not have to affirm a trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objective-corroborated testimony where the record indicates no sound reason for its rejection. Here, there was nothing to contradict the testimony of Dr. Billiodeaux that he found objective findings. This, coupled with the fact that both doctors believed Ms. Williams's subjective complaints, establish that the jury was clearly wrong in rejecting causation and not awarding damages.

The majority infers that the jury "apparently questioned" Ms. Williams's credibility. How this conclusion is reached is puzzling. It is pure speculation

2

given that both medical providers testified that no reasons existed to question her credibility or veracity, and that she was not malingering.

For the foregoing reasons, I dissent and would reverse the finding of a lack of causation and conduct a de novo review of the record. *See*, *Thibodeaux v. Donnell*, 16-570, (La. 1/20/17), 2017 WL 264533.